175 N.J. Super. 212 (1980)
417 A.2d 1119
WAYNE C. POMANOWSKI, PLAINTIFF,
v.
MONMOUTH COUNTY BOARD OF REALTORS, A NEW JERSEY CORPORATION; MONMOUTH COUNTY MULTIPLE LISTING SERVICE; NEW JERSEY ASSOCIATION OF REALTORS; NATIONAL ASSOCIATION OF REALTORS; WILLIAM G. KIRCHER; AND CHARLES DARRAH, DEFENDANTS.
Superior Court of New Jersey, Chancery Division Monmouth County.
Decided June 11, 1980.
*214 Frederick A. Organ for plaintiff (Organ & Strawinski, attorneys).
C. Keith Henderson and Richard H. Mills, for defendants Monmouth County Board of Realtors, Monmouth County Multiple Listing Service, William G. Kircher and Charles Darrah (Lautman, Rapson & Henderson, attorneys).
Arthur M. Greenbaum for defendant amicus curiae New Jersey Association of Realtors (Greenbaum, Greenbaum, Rowe & Smith, attorneys).
YACCARINO, J.S.C.
This case addresses the question of whether the requirement that a real estate broker join local, state and national realtor boards before he may have access to a multiple listing service violates the New Jersey Antitrust Act, N.J.S.A. 56:9-1 et seq. On a motion for summary judgment this court, applying the rule of reason analysis, determined that such a restriction does create an unlawful restraint of trade, 152 N.J. Super. 100. On appeal, the Appellate Division agreed that the rule of reason analysis was appropriate but reversed and remanded for detailed findings of fact. 166 N.J.Super 269. A lengthy hearing was held, at which time the court made the following findings.
Our antitrust law, as modeled after the Sherman Act, prohibits "[e]very contract, combination ... or conspiracy in restraint of trade or commerce." N.J.S.A. 56:9-3. Not all restraints, however, are illegal. It is only those contracts which unreasonably restrain trade that are prohibited. Finlay & Assoc., Inc. v. Borg-Warner Corp., 146 N.J. Super. 210 (Law Div.), aff'd 155 N.J. Super. 331 (App.Div. 1976). In applying the "rule of reason" analysis to determine which contracts or combinations are unduly restrictive, a court must "focu[s] directly on the challenged restraint's impact on competitive conditions." Nat'l. Society of Professional Engineers v. U.S., 435 U.S. 679, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978). Such a study involves an evaluation of the facts peculiar to the business, the history of the restraint and the reasons why it was imposed. Id. at 1365. *215 The end product is "to form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry." Id. (emphasis supplied).
Significant to such a determination is the percentage of business controlled, compared to the strength of the remaining competition. U.S. v. Columbia Steel Co., 334 U.S. 495, 527, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948). The impact of the Monmouth County Multiple Listing Service (MCMLS) on the real estate business in Monmouth County, whether viewed statistically or in light of the realities of the marketplace, is substantial.
The need for a multiple listing service (MLS) is twofold. The numerous listings provided through the MCMLS are important to buyers as a means of providing a wide range of selection. Similarly, most sellers prefer the increased market available to them through MLS. Consequently, when plaintiff terminated his membership with the Monmouth County Board of Realtors (MCBR) and thereby lost access to the MLS, which is provided by the Board to its members, his sales staff left him, since his own small business with its insignificant number of listings could not compete with the advantages of an office with access to MLS. See Oates v. East Bergen Cty. Multiple Listing Serv., 113 N.J. Super. 371, 380-82 (Ch.Div. 1971); Grillo v. Bd. of Realtors of Plainfield, 91 N.J. Super. 202, 220-21 (Ch.Div. 1966).
Before discussing the impact of the MCMLS in terms of volume, it is necessary to determine the relevant marketplace. See Marin County Bd. of Realtors, Inc. v. Palsson, 16 Cal.3d 930, 130 Cal. Rptr. 1, 549 P.2d 833 (Sup.Ct. 1976). On this question, the court is of the opinion that the study be limited to Monmouth County, excluding those nine municipalities which comprise the Southern Monmouth County Board of Realtors. See United States v. Tracinda Investment Corp., 477 F. Supp. 1093 (C.D.Calif. 1979). The Southern Monmouth County Board has its own MLS and defendants offered no proof to indicate that this area had any impact on the MCBR's territory. Besides the fact that the MCBR's jurisdictional territory is limited to the *216 county, it was clearly established that at least 85% of the listings processed by the MCMLS come from the MCBR territory. This finding is supported by the plaintiff's study of his listings available on a given date. For January 22, 1980, of 2,427 listings in the book, 2,077 of those listings were in the MCBR jurisdictional territory. Furthermore, a study conducted by William Trombetta of the Anti-trust Section of the State Division of Criminal Justice indicated that for a two-month period covering November and December 1975, only 6% to 8% of the listings were from outside the jurisdictional territory.
The court is further of the opinion that the relevant market place must be restricted to residential sales. See Marin Cty. Bd. of Realtors v. Palsson, supra. Trombetta, qualified as a marketing expert, testified that, from a marketing standpoint, residential and commercial markets are of interest to different segments of the public with different needs. In addition, in reviewing the MLS Activity Report for 1978, it appears that residential listings comprised approximately 90% of the listings. Moreover, 97% of those listings resulted in closed sales of residential property.
In light of the foregoing, the court has determined that through MLS, the MCBR controls at least 50% of the residential real estate business of the County. Defendants had stipulated to having processed 25% and 29% of all sales for the fiscal years 1978 through 1979 and 1977 through 1978. However, these figures include commercial property, farms and vacant property which should be excluded, since, as noted above, the relevant market is residential sales. By excluding the nonresidential categories of sales, the percentage is higher since the total number of relevant sales is less than as calculated by defendants. Defendants also, in this court's opinion, wrongfully excluded intra-office sales. While such property was sold by the listing broker, it was nevertheless multiple-listed and, as such, available to other brokers. It is the fact of listing and sale of residential property through MLS that is relevant to this court.
Returning to plaintiff's figures, for the calendar year 1977 there was a total of $319 million sales volume of residential *217 property in Monmouth County. Of this sum $223 million of sales were processed through MLS, showing 70% of the business going through MLS. This percentage was lessened, however, when the dollar value of nonusables in categories where brokers may participate was added to the total sum of residential sales. The figure was further lessened by factoring out 10% to 15% to allow for out-of-jurisdiction sales. The lowest figure, however, was 50% of all sales.
The 1978 Monmouth County telephone book "Yellow Pages" were also used to conduct an analysis of the number of real estate brokerage firms that were Monmouth County MLS members. Specialists in rentals, condominiums, development companies and independent brokers (so stated in the Yellow Pages) were immediately removed. Out of a total of 260 brokerage firms, 40 were immediately removed, leaving 220 firms as the relevant market base according to the Yellow Pages.
The remaining firms were identified as members in the MCMLS from information obtained in the Bluebook of the Monmouth County Board of Realtors, and in the listing as an MCMLS member in the Yellow Pages. This resulted in a total of 172 MCMLS members.
The remaining 48 brokerage firms were then called. Sixteen firms were then eliminated from the 48 firms. These were firms which were not active, could not be contacted, or who were not residential real estate firms. Eighteen of the remaining listings called were not MCMLS members. The remaining 14 firms called were MCMLS members. Therefore, the 220 Yellow Page listings for Monmouth County were broken down accordingly:

 Total: 220 Eliminated MCMLS Member
 Bluebook 172
 Called: 48 34 14
 ___
 186
 Market Share: 186
 ___ = 84%
 220

*218 Finally, plaintiff testified that he used the roster of MCMLS participants, provided by the defendants in discovery, to determine the number of brokerage agencies and salespersons participating in the MCMLS. This count by plaintiff indicates that there were 228 real estate brokerage agencies/brokers and 1,664 real estate salespersons participating in the MCMLS. Therefore, on one hand, the listings obtained by plaintiff are disseminated to almost 1,900 brokers and salespersons rather than to plaintiff and his three salespersons, and, on the other hand, plaintiff and his sales staff have access to listings produced by almost 1,900 real estate brokers and salespersons.
Under a "rule of reason" analysis, consideration must also be given to the possible justifications for the practices. Bd. of Trade of Chicago v. U.S., 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918). In this regard, defendants urge that the nonaccess rule is justified by the nexus existing between the MCBR and the MLS.
Primarily, defendants referred to the integration of activities between the Board and MLS. For example, it was testified that Board members volunteer countless hours to the MLS committee, and that the Board's arbitration and grievance services provide mediation between MLS participants and aggrieved members of the public. In addition, it was shown that the state and national realtor organizations provide educational benefits in connection with MLS. While there is undoubtedly some interrelationship between the various committees of the MCBR, this court is not convinced that it is substantial or that it outweighs the impact of the nonaccess rule.
The court would first refer to the history of the concept of a multiple listing service. Robert F. Ferguson, executive vice-president of the New Jersey Association of Realtors, testified to the reluctance on the part of local boards initially to accept multiple listing. It was only after numerous campaigns were waged stressing the benefits of such a service that it became popular. As such, the court is not convinced that, as defendants have urged, the MCBR will lose its raison d'etre if the Board *219 must open the MLS to non-realtors, or the MLS becomes independent.
Secondly, the court would point out that the testimony of Harry J. Gerlach, a realtor and executive officer of the MLS of Northern New Jersey, demonstrated that an independent MLS can function efficiently although it is not a part of a realtor organization. Any grievances may be addressed to the State Real Estate Commission. Moreover, the independent organization is totally self-supporting, thus obviating the need for volunteers from outside those participating in the service. Finally, in Gerlach's opinion the realtor membership and information which he gained as a realtor had no effect on management of his MLS.
Furthermore, plaintiff has posited that defendants have less onerous means available to promote their benefits. In United States v. Third National Bank in Nashville, 390 U.S. 171, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1968), the court stressed that the proponents of a bank merger bore the burden of establishing that the benefits expected could not be obtained by an alternate means. In a similar vein, this court finds that an independent MLS would be free to develop its own committees on arbitration, education or affirmative action. Moreover, the court is not convinced that if MLS were separate from the MCBR, the Board would necessarily lose its members. Indeed, such a position would indicate that MLS is nothing more than a drawing card for the Board, thus questioning further the reasons why the Board wishes to allow access to MLS to only MCBR members.
Giving due regard to the court's opinion in State of Iowa, ex rel. Miller v. Cedar Rapids Real Est. Bd., 1979 Tr.Cas. ¶ 63,102 at 77,043 (D.C. Iowa 1979), that the dependence of the MLS on the local board justified the nonaccess rule, this court is simply not convinced that multiple listing in Monmouth County will cease unless it is part of the MCBR.
Defendants also argued that the Code of Ethics which controls members of the MCBR and the numerous educational programs provided by both the local and national boards benefit those consumers who purchase through MLS. The court in Marin Cty. *220 Bd. of Realtors v. Palsson, supra, rejected this justification, noting that the Board had failed to show any increase in professional or ethical competence, 549 P.2d at 845. Similarly, this court finds that defendants have no data to support their contention that a member of the public readily associates the realtor and MLS trademarks with "knowledgeable, efficient and honest handling of real estate transaction." Rather, empirical studies of consumer complaints conducted by the Attorney General's office indicated that at a minimum, no discernable difference existed in the reliability of a Realtor as opposed to a broker who was not a realtor.
Defendants have also attempted to make much of the fact that plaintiff voluntarily withdrew his membership in the MCBR. They refer to the Maryland decision in Grempler v. Multiple Listing Bur. of Harford Cty., Inc., 258 Md. 419, 266 A.2d 1 (Ct.App. 1970), wherein the court upheld the Bureau's requirement that an applicant maintain an office in the county in order to gain access to the local MLS. This case is distinguishable, however, since the court specifically noted that not only had plaintiff failed to support her contention that the Bureau amounted to a monopoly, but also that of the 72 licensed brokers in Harford County, 58 were members of the real estate board, while only 12 were associated with the multiple listing bureau. 266 A.2d at 6. Thus, the significance of access to a multiple listing service appeared to the court in Grempler to be minimal.
Barrows v. Grand Rapids Real Est. Bd., 51 Mich. App. 75, 214 N.W.2d 532 (App.Ct. 1974), also appears to be inapplicable to the case at bar. There, too, Board membership was required before a broker could obtain access to multiple listing. In upholding the requirement, the court noted the interrelationship between the Board and the MLS. However, the court also went on to note that the testimony established the ability of nonrealtor brokers to successfully compete with members of the Board and also that the MLS made substantially less than 50% of the real estate sales in the area and that a substantial number of realtors are not members of the local board. 214 N.W.2d at 540. Based on the findings previously discussed, the impact of MLS in *221 Monmouth County is certainly greater, and, in this court's opinion, requires more of justification than the various interrelationships noted above.
While the decision of Collins v. Main Line Brand of Realtors, 452 Pa. 342, 304 A.2d 493 (Sup.Ct.), cert. den. 414 U.S. 979, 94 S.Ct. 291, 38 L.Ed.2d 223 (1973), is also distinguishable in that plaintiff was denied access as opposed to voluntarily withdrawing from the Board, the court nevertheless acknowledged that the relevant test for an anti-trust violation is whether or not a broker without access to multiple listing can successfully compete with those who do have access. 304 A.2d at 496. The voluntariness of plaintiff's action, therefore, is not controlling.
It is the considered opinion of the court that the MCBR through the MLS, controls a substantial segment of the real estate market in Monmouth County. To deny plaintiff, a nonrealtor, access to that MLS has the effect of foreclosing his ability to successfully compete in the real estate business. Moreover, the proposed justification for the rule, the amount of support given to MLS by the Board, does not outweigh the damage to plaintiff. The court, therefore, finds, based upon the evidence and applicable law, that the nonaccess rule does violate the New Jersey Antitrust Act, and judgment will be entered in favor of plaintiff.