WAYNE C. POMANOWSKI, PLAINTIFF-RESPONDENT, v. MON-
MOUTH COUNTY BOARD OF REALTORS, A NEW JERSEY
CORPORATION, AND MONMOUTH COUNTY MULTIPLE LIST-
ING SERVICE, DEFENDANTS-APPELLANTS, AND NEW JER-
SEY ASSOCIATION OF REALTORS, NATIONAL ASSOCIA-
TION OF REALTORS, WILLIAM G. KIRCHER, AND CHARLES
DARRAH, DEFENDANTS.

Argued January 25, 1982—Decided May 10, 1982.

308

*C. Keith Henderson* argued the cause for appellants (*Lautman, Rapson, Henderson & Mills,* attorneys; *C. Keith Henderson* and *Richard H. Mills,* on the brief).

*Paul V. Strawinski* argued the cause for respondent (*Organ & Strawinski,* attorneys).

*Arthur M. Greenbaum* argued the cause for *amicus curiae* New Jersey Association of Realtors (*Greenbaum, Greenbaum, Rowe & Smith,* attorneys; *Arthur M. Greenbaum, Harriet F. Klein* and *Amy Reisen Freundlich,* on the brief).

*Laurel Price,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *William L. Trombetta,* Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

CLIFFORD, J.

Defendant Monmouth County Board of Realtors (MCBR or the Board) is a trade association affiliated with defendants New

Jersey Association of Realtors and National Association of Realtors® [1]. MCBR makes available to its members the Monmouth County Multiple Listing Service (MCMLS), which operates as a committee of the Board. A by-law of the MCBR requires that as a precondition to access to MCMLS, a real estate broker be a member of the Board. The principal issue is whether that arrangement constitutes a violation of the New Jersey Antitrust Act, *N.J.S.A.* 56:9–1 to –19, as held by the court below, *Pomanowski v. Monmouth County Board of Realtors*, 175 *N.J.Super.* 212 (Ch.Div.1980). We hold to the contrary and hence reverse.

I

Plaintiff, Wayne Pomanowski, a licensed real estate broker, operates the Thompson Agency in Tinton Falls, Monmouth County. From 1972 until 1977 plaintiff was a member of both MCBR and MCMLS and had access to the multiple listing service as a member of the Board. In April 1977 plaintiff terminated his membership in the Board by not paying dues for himself and his salespeople. He was thereupon denied participation in MCMLS.[2]

Shortly thereafter, plaintiff commenced this suit against MCBR; MCMLS; the National Association of Realtors; William G. Kircher, executive officer of MCBR; and Charles Darrah, president of MCBR. By amended complaint plaintiff alleged that in conditioning participation in MCMLS on membership in MCBR, defendants had restrained trade and conspired to restrain and monopolize trade in violation of *N.J.S.A.* 56:9–3 and

---

[1]The term "Realtor" is a registered mark of the National Association of Realtors, used to refer only to members of the Realtor trade association. The National Association licenses state and local Boards to use this mark.

[2]Although plaintiff stopped paying his MCMLS dues as well, defendants concede that failure to pay MCBR dues would alone have precluded his participation in MCMLS. By the terms of a consent order signed June 24, 1977, plaintiff has been permitted to pay his MCBR dues in escrow and to participate in MCMLS until conclusion of the case.

–4 (the monopoly theory was not pursued). Plaintiff sought injunctive relief under *N.J.S.A.* 56:9–10 and treble damages under *N.J.S.A.* 56:9–12 (the claim for damages was later waived).

On defendants' motion for summary judgment, the trial court entered judgment in favor of plaintiff pursuant to *R.* 4:67–5, declaring the limitation of participation in the multiple listing service to members of MCBR an unlawful restraint of trade. *Pomanowski v. Monmouth County Board of Realtors,* 152 *N.J. Super.* 100, 109 (Ch.Div.1977). The court recognized that alleged anticompetitive activity is generally analyzed under one of two standards: either it is condemned automatically as a *per se* violation of the antitrust law, or it is evaluated to determine whether it in fact causes significant harm relative to the business justification. The latter test—the rule of reason—is applied where restrictive conduct is not "manifestly anticompetitive," so that searching inquiry into both the degree of harm and the proferred business rationale is warranted. *Continental T.V. v. GTE Sylvania Inc.,* 433 *U.S.* 36, 49, 97 *S.Ct.* 2549, 2557, 53 *L.Ed.*2d 568, 580 (1977). Adopting this "rule of reason" analysis, the court found that because Board membership is "totally unrelated" to the operation of the multiple listing service, there existed no bona fide justification for restricting multiple listing service access to Board members only. 152 *N.J.Super.* at 108. Both MCBR and MCMLS were enjoined from denying non-members equal access to the multiple listing service. Inasmuch as the declaratory and injunctive remedy afforded plaintiff complete relief, the court entered judgment in favor of the other named defendants. *Id.* at 109.

On the appeal of MCBR and MCMLS the Appellate Division agreed that the "rule of reason" analysis was appropriate; it concluded that since membership in the MCBR was available on payment of dues to all New Jersey real estate brokers, and since plaintiff had been a member but had resigned voluntarily, the membership requirement was not "manifestly anticompetitive." *Pomanowski v. Monmouth County Board of Realtors,* 166 *N.J.*

*Super.* 269, 271–72 (1979). However, inasmuch as the "rule of reason" analysis normally requires " 'an ascertainment of the facts peculiar to the particular business,' " *id.* at 274, quoting *White Motor Co. v. United States,* 372 *U.S.* 253, 261, 83 *S.Ct.* 696, 700, 9 *L.Ed.*2d 738, 745 (1963), and because the trial court's conclusions were based upon an inadequate factual basis, the Appellate Division remanded the case for a plenary hearing, on the basis of which the trial court was to "construct [its] determination with the bricks and mortar of detailed findings of fact and conclusions of law." 166 *N.J.Super.* at 274. We denied certification, 81 *N.J.* 260 (1978).

On remand plaintiff sought to establish that MCMLS controlled the real estate market in Monmouth County, so that an individual broker's participation in the service was essential to his continued ability to compete. Plaintiff argued that far from being a mere service to members of MCBR, the MCMLS was a practical economic necessity to small brokers like himself. Finally, he contended that there was no adequate business justification for conditioning access to MCMLS on Board membership.

Defendants urged that the MCMLS share of the real estate market was far smaller than plaintiff alleged, and that in any event, restricting MCMLS access to Board members was reasonable. They argued that inasmuch as membership in the Board is open to all licensed brokers, and since neither the Board dues nor MCMLS fees are exorbitant, a requirement of Board membership has no anticompetitive effect. As additional support for their position they emphasized the linking of MCBR to MCMLS as evidenced by the many hours of volunteer services, arbitration and grievance functions, and educational benefits supplied by Board members to MCMLS.

After a hearing in which both the Attorney General, on behalf of the Antitrust Section of the Division of Criminal Justice, and the National Association of Realtors participated as *amici curiae,* the trial court entered judgment for plaintiff. It determined that through MCMLS, the MCBR controlled at least 50% of the

residential real estate business of Monmouth County. 175 *N.J. Super.* at 216. The asserted advantageous nexus between the MCBR and the MCMLS in the form of volunteer activities was not considered sufficiently important to outweigh the anticompetitive effect of the non-access rule. *Id.* at 218–19. Therefore the court enjoined MCBR from requiring membership in the Board as a precondition to participation in the MCMLS. In addition it awarded attorney's fees and costs of suit to plaintiff.

On this appeal on grant of direct certification, 87 *N.J.* 426 (1981), defendants claim that the trial court erred, both in its analysis of the defendants' market share and in its determination that membership in MCBR posed an unreasonable condition on access to the MCMLS. They contend that controlling weight must be given to federal case law, and that federal cases raising the question at issue here have all been decided in their favor. In addition, defendants have moved to suppress the brief and appendix of the *amicus curiae* Attorney General. Decision on that motion was reserved until disposition of the appeal.

## II

This Court recently recognized certain aids in the determination of the antitrust implications of arrangements such as that structured by the MCBR–MCMLS, in the light of our relatively new Antitrust Act, *N.J.S.A.* 58:9–1 to –19.

> [C]onsonance between the federal and state enactments is required. Courts in assessing state antitrust acts patterned after the federal Sherman Act, as is the New Jersey act, have concluded that federal court interpretations of federal law constitute persuasive authority as to the meaning of the particular state enactments. Moreover, the New Jersey act is to be construed "in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it. *N.J.S.A.* 56:9–18." [*State v. Lawn King,* 84 *N.J.* 179, 192 (1980) (citations omitted).]

Accordingly, we are required to follow "ruling judicial interpretations" on the issue before us. As to precisely that issue, however, the United States Supreme Court has rendered no

decision directly on point.[3] Nevertheless, the federal cases are useful in developing an analytical framework in which to address the restraint-of-trade question, as are other state court decisions construing state antitrust acts in accordance with federal court interpretations of the Sherman Act. See *N.J.S.A.* 56:9–18.

### III

The courts below judged the conduct of MCBR and MCMLS under a "rule of reason" standard, see *supra* at 311–12. In that connection it bears emphasis that MCBR membership is available to all on precisely the same terms: the securing of a valid real estate broker's license and the payment of MCBR dues and an MCMLS initiation fee.[4] Significant too is the fact that

[3]Defendants invite our attention to several federal district court decisions that seem to be apposite: *Brown v. Indianapolis Board of Realtors*, 1977–1 Trade Reg.Rep. (CCH) ¶ 61,435 (S.D.Ind.1977) (no antitrust violation where broker denied membership to Board of Realtors, based on failure to show "favorable business reputation in the community"); *Martin-Trigona v. National Association of Realtors*, 1978–1 Trade Reg. Rep. ¶ 61,915 (E.D.Ill.1978) (memorandum opinion relying on *Brown, supra,* for proposition that Realtor Board, as a voluntary trade association, may properly exclude any nonmember from participation in its varied activities); *Murphy v. Alpha Realty, Inc.,* 1978–2 Trade Reg.Rep. (CCH) ¶ 62,388 (N.D.Ill.1978) (relying on *Brown, supra,* for proposition that Board membership is acceptable limitation on multiple listing service participation); *Colorado ex rel. MacFarlane v. Colorado Springs Board of Realtors,* 1980–81 Trade Reg.Rep. ¶ 63,653 (Dist.Ct.Col. 1980), (only membership requirements necessary to efficient operation of multiple listing service permissible, where Realtor Board and multiple listing service considered single identity). Because these trial court opinions treat the multiple-listing-access-question in a cursory manner, they lack persuasive force and amount to no more than a respected source of instruction. *Cf. Clairol Inc. v. Cosmetics Plus*, 130 *N.J.Super.* 81, 94–101 (Ch.Div.1974) (containing painstaking analysis of pertinent authorities).

[4]Every broker-member of MCBR is required to pay annual dues of $170 ($125 when plaintiff quit the Board), plus a $40 fee for each salesperson in his employ. Each Realtor who elects to participate additionally in MCMLS is required to pay an initiation fee of $250, in addition to monthly fees of $25 and $15 for employed brokers and salespeople respectively.

plaintiff had been a member of both MCBR and MCMLS for five years and then voluntarily resigned.

The subject of the considerations that dictate application of the "rule of reason" rather than the "*per se*" rule might in other circumstances warrant extended treatment, but the concise discussions of that provocative issue by the courts below suffice for today's purposes. See 152 *N.J.Super.* at 105–07, 166 *N.J.Super.* at 271–73. Particularly is this so in view of the parties' agreement that the "rule of reason" provides the appropriate framework of analysis for this case.

Although we do not agree in all respects with its rulings on and analysis of the evidence, the trial court used the appropriate methodology in applying the rule. As first framed in *Standard Oil Co. v. United States*, 221 *U.S.* 1, 31 *S.Ct.* 502, 55 *L.Ed.* 619 (1911), the "rule of reason" requires the court to weigh all the circumstances of a given case to determine whether the disputed practice constitutes an "unreasonable restraint on competition." *State v. Lawn King, Inc., supra*, 84 *N.J.* at 194. See also *Continental T.V., Inc. v. G.T.E. Sylvania, Inc., supra*, 433 *U.S.* at 49, 97 *S.Ct.* at 2557, 53 *L.Ed.2d* at 580. The court must subject the challenged restraint's impact on competitive conditions to probing examination. *United States v. Realty Multi-List, Inc.*, 629 *F.2d* 1351, 1362 (5th Cir. 1980). See also *National Society of Professional Engineers v. United States*, 435 *U.S.* 679, 688, 98 *S.Ct.* 1355, 1363, 55 *L.Ed.2d* 637, 648 (1978). The rule envisions a balancing process that scrutinizes the competitive significance of a given practice: if the procompetitive benefits of that practice exceed any anticompetitive effects, the restraint will pass muster under the Sherman Act, 15 *U.S.C.* § 1, and likewise under *N.J.S.A.* 56:9–3. See *Chicago Board of Trade v. United States*, 246 *U.S.* 231, 238, 38 *S.Ct.* 242, 243, 62 *L.Ed.* 683, 687 (1918). This balancing process calls for two steps: first, a definition of the relevant market or markets in which the questioned restraint operates; and second, an evaluation of the "evils" inherent in the challenged practice and a weighing of

those anticompetitive influences against any procompetitive justifications.

For the purposes of this case, the pertinent markets are the relevant geographic and product markets. In respect of the former, the trial court correctly found Monmouth County to be the appropriate geographic market. 175 *N.J.Super.* 215–16. As to the relevant product market the trial court limited its analysis to a determination of defendants' control over residential real estate in Monmouth County, excluding commercial property, farms and vacant property. 175 *N.J.Super.* at 216. See also *United States v. Realty Multi-List Inc., supra,* 629 *F.*2d at 1372; *Marin County Board of Realtors v. Palsson,* 16 *Cal.*3d 920, 936, 549 *P.*2d 833, 842, 130 *Cal.Rptr.* 1, 10 (1976). This too was the correct approach. The evidence established that the overwhelming number of MCMLS listings are residential (defendants' own Confidential Activity Report for 1978–79 showed that 90% of all listing processed by MCMLS were residential property), and plaintiff's assertion that he dealt almost exclusively with the sale of residential property was undisputed.

The next step in applying the "rule of reason" requires examination of defendants' impact upon those markets, a point on which the record is less than clear. To evaluate that impact, the trial court looked to (1) the defendants' share of residential real estate sales in Monmouth County, and (2) the number of active Monmouth County real estate brokers participating in MCMLS. As to the former, in the absence of any readily accessible real estate sales data source, both the plaintiff and the defendants relied on the Monmouth County tax records for the 1977 calendar year. Their review of these records produced different conclusions regarding defendants' total share of residential real estate sales: plaintiff arrived at a figure of approximately 50%, whereas defendants believed their share amounted to only 27%. The variance in these figures is not surprising, given the degree of speculation that afflicts the parties' calcula-

tions.[5]  Moreover, the trial court's determination of the number of active Monmouth County real estate brokers participating in MCMLS was tainted by the demonstrable unreliability of its source: a Yellow Pages telephone book survey produced by the Antitrust Section of the Division of Criminal Justice.[6]

■  Accordingly, we can have little confidence that the figures presented as true indicators of defendants' market impact are reliable.  Indeed, the sharp disparity in the stated percentages alone raises questions as to their accuracy.  However, when these "empirical" assessments are coupled with defendants' stipulation that they were instrumental in over 25% to 29% of *all* real estate sales for the fiscal years 1977–78 and 1978–79, we can reasonably infer that the defendants maintain the requisite

---

[5]For instance, the Monmouth County tax records proved to be a doubtful source of relevant information because of the failure of those records to indicate whether a given transfer was effected through the services of a real estate broker.  Consequently, although the parties could determine the dollar value of residential sales in the MCBR-chartered jurisdictional territory in 1977, they could only guess at the proportion of those sales that involved real estate brokers.

[6]The Yellow Pages survey sought to compare the total number of active real estate brokers in the MCBR-chartered jurisdictional territory with the number of brokers actually participating in the MCMLS.  In order to arrive at the latter figure the Antitrust Section compared Red Bank-area Yellow Pages advertisers specifying that they were MCMLS participators with the MCBR membership roster.  When a name appeared on both "lists", the broker was assumed to have been a member of the MCMLS, as opposed to another multiple listing service.  Those Yellow Pages advertisers who concentrated on property sales other than residential real estate were excluded from the survey (the Antitrust Section offered no explanation, however, as to why condominium sellers were excluded).  Because there are three Monmouth County telephone books (Red Bank, Asbury Park and Freehold), advertisers may choose to advertise in any one or more of the Yellow Pages books.  It follows, then, that in limiting the survey to the Red Bank Yellow Pages, the Antitrust Section may have artificially reduced its final tally of Monmouth County real estate brokers.  Moreover, the entire survey rests upon the dubious assumption that all real estate brokers located in the MCBR-chartered jurisdictional territory advertise in the Red Bank Yellow Pages.

market power to warrant our further scrutiny of their conduct under the Antitrust Act.

## IV

The foregoing analysis leads us to the heart of the case: a determination of the "reasonableness" of the restraint and particularly its impact on competition. *Professional Engineers, supra*, 435 *U.S.* at 688, 98 *S.Ct.* at 1363, 55 *L.Ed.2d* at 648.

In *Grillo v. Board of Realtors*, 91 *N.J.Super.* 202 (Ch.Div.1966), the court assessed the competitive significance of the multiple listing service as a real estate marketing technique:

> There is good in the multiple listing system. It provides an effective method for selling and buying properties. The seller benefits because his property is exposed in a number of offices, hence reaches a wider market in a shorter period of time. It is also useful and convenient to the prospective buyer who is seeking a house that will suit his needs and purse. From one selling agent he can learn of many of the properties for sale in the area. In effect, the multiple listing service operates as an exchange for the sale of real estate. The multiple listing system can potentially stimulate competition in the real estate field by placing listings in the hands of all brokers in the area. [*Id.* at 218–19.]

See also Austin, "Real Estate Boards and Multiple Listing Systems as Restraints of Trade," 70 *Colum.L.Rev.* 1325, 1353–54 (1970).

The procompetitive virtues of a multiple listing service are obvious; it is an ingenious mechanism for reducing the market imperfections inherent in the real estate industry. It operates as a clearing house of sorts in that the purchaser has access to a wide selection of properties and the vendor-broker is exposed to a larger market than could be reached through the unaided efforts of a single seller. At the same time, however, where the service has substantial market power, an excluded broker may be unable to compete effectively, given his limited abilities to find prospective purchasers and offer a range of listings comparable to those held by the service. The individual broker so situated "has only a limited supply of 'shoes on the shelves.'" *Oates v. Eastern Bergen County Multiple Listing Service, Inc.*, 113 *N.J.Super.* 371, 382 (Ch.Div.1971) (absolute exclusion of

broker by independently-run multiple listing service held violative of Antitrust Act).

Defendants contend that since a trade association is entitled to confine its benefits to members, and since participation in MCMLS is a membership benefit offered by MCBR, there is no antitrust violation in limiting MCMLS access to Board members. Although there are multiple listing services that operate independently of realtor boards, defendants argue that MCMLS is "inextricably interconnected" with MCBR and thereby dependent upon the Board for its success. Further, defendants assert that this "interconnection" enables MCMLS to achieve certain procompetitive benefits that would be unavailable were the MCMLS independent. First, they point out that MCMLS uses both the National Association of Realtors trademark and the Multiple Listing Service logo. See n.1, *supra* at 310. These symbols purportedly attract customers by assuring the public of the propriety of the business organization with which they are dealing. Additionally, MCBR promulgates a code of ethics, imposes sanctions upon delinquent members, and provides facilities for arbitration of disputes and resolution of ethics complaints. These assurances, the argument goes, help to overcome the reluctance of home-sellers to authorize multiple listing service brokers to serve as sub-agents of the listing broker.

Of pivotal importance, however, is the fact that MCMLS shares office space, personnel, and equipment with MCBR. Moreover, MCBR members volunteer hundreds of hours to the operation of MCMLS. As a consequence, defendants contend, Board affiliation provides MCMLS with economies of operation not available to an independent multiple listing service. Defendants argue that because Board members would hardly volunteer time and agree otherwise to subsidize MCMLS if its benefits were available equally to nonmembers of the Board, the effect of severing MCMLS participation from Board membership would be to increase the operating cost of MCMLS. The result would be the erection of a barrier to entry represented by the increased cost of running such a multiple listing service.

In evaluating these contentions, the trial court implicitly assumed that the proper question was whether MCMLS could survive if it functioned independently of MCBR. Thus, the court pointed to testimony that "demonstrated that an independent MLS can function efficiently although it is not a part of a realtor organization." 175 *N.J.Super.* at 219.[7]  Whatever benefits the Board bestowed on MCMLS could be duplicated, since "an independent MLS would be free to develop its own committees on arbitration, education or affirmative action." *Id.*  Finally, the court noted that it was "simply not convinced that multiple listing in Monmouth County will cease unless it is part of the MCBR." *Id.*

■  The appropriate question, however, is not whether MCMLS would be destroyed in the absence of the challenged MCBR membership rule (almost certainly it would not), but rather whether the anticompetitive effects of conditioning MCMLS access on Board membership are outweighed by the procompetitive gains that flow from Board sponsorship of MCMLS.  If that competitive benefit would be lost, and if such loss would outweigh the negative effect of the access rule, then

---

[7]Although the trial court relied heavily on the testimony of Harry J. Gerlach, executive officer of the Multiple Listing Service of Northern New Jersey, to establish that multiple listing services do operate without Realtor Board sponsorship, it appeared to ignore the fact that the initiation fee for the Northern New Jersey Multiple Listing Service is $1300 as compared to the $250 fee maintained for the MCMLS.  The annual cost of MCBR membership with MCMLS participation for a broker and one salesperson is $690.  The annual cost of Northern New Jersey Multiple Listing Service membership for a broker with a single salesperson is $308 plus $25 for each listing submitted. To a firm that handles fifteen listings, then, the cost of the two memberships is roughly equal.  An apples-oranges comparison does not, of course, demonstrate that Board-affiliated multiple listing service participation is cheaper.  It does suggest that in focusing on whether MCBR benefits could be reproduced outside the organization, the trial court appeared to brush aside the possibility that the cost of such benefits might then be substantially higher.  The court appears not to have considered the procompetitive benefits (as opposed to the benefit to MCBR or to MCMLS) that arises from Board sponsorship of MCMLS.

the rule is an acceptable limitation on competition. See *Professional Engineers, supra,* 435 *U.S.* at 688, 98 *S.Ct.* at 1363, 55 *L.Ed.*2d at 648. In centering its inquiry upon whether MCMLS would survive absent the access rule, the trial court failed to strike the necessary balance.

Moreover, the trial court treated the case as one involving a denial of access; it apparently attached little significance to the fact that plaintiff's withdrawal from the MCMLS was voluntary and that he is free to rejoin on payment of his MCBR dues. 175 *N.J.Super.* at 220–21. The question of access to multiple listing services has been dealt with previously in two New Jersey cases, *Grillo v. Board of Realtors, supra,* and *Oates v. Eastern Bergen County Multiple Listing Service, Inc., supra.* In both *Oates* and *Grillo,* the exclusion was absolute—in *Oates* the plaintiff realtor was denied access to the defendant multiple listing service; in *Grillo* multiple listing service participation was conditioned on Realtor board membership, which was denied to plaintiff. The courts found in *Oates* a violation of the Antitrust Act and in *Grillo* a common law restraint of trade. The court in *Grillo,* however, distinguished that case from one in which access to the multiple listing service, while conditioned on Realtor Board membership, was as a practical matter open to all. "If every licensed real estate broker in the Plainfield area could become a member of the Board for the asking, no non-member would have cause for complaint about being excluded from the benefits of the multiple listing service." 91 *N.J.Super.* at 210.

Although a number of courts in other jurisdictions have ruled on the question of access to a multiple listing service, most cases have arisen in the context either of exclusion from an independent multiple listing service, *United States v. Realty Multi-List, supra,* (multiple listing service's restrictions on membership held unreasonable restraint on trade); *Blake v. H–F Group Multiple Listing Service,* 36 *Ill.App.*3d 730, 345 *N.E.*2d 18 (App.Ct.1976) (exclusionary membership requirements of multiple listing service do not violate Antitrust Act absent a deleterious effect on competition); *Grempler v. Multiple Listing Bureau,* 258 *Md.* 419,

266 *A.2d* 1, 45 *A.L.R.3d* 180 (Ct.App.1970) (membership require-
ment of multiple listing service reasonable), or exclusion from
Realtor membership where such membership was required for
multiple listing service participation, *Brown v. Indianapolis
Board of Realtors, supra* (broker denied membership in board of
realtors, based on failure to show "favorable business reputation
in the community"—no antitrust violation); *Collins v. Main Line
Board of Realtors,* 452 Pa. 342, 304 *A.2d* 493 (Sup.Ct.1973)
(broker denied membership in Board of Realtors; Board ordered
either to admit brokers as members or to permit nonmembers to
participate in multiple listing service).

The few courts that have considered whether multiple listing
service participation may be conditioned on realtor board mem-
bership absent any exclusionary membership requirement have
reached varying results. In *Marin County Board of Realtors,
Inc. v. Palsson, supra,* a realtor board required that applicants
for membership be "primarily engaged" in the real estate busi-
ness, and denied nonmembers access to its multiple listing
service. The court held that "[t]he board's rules denying access
of nonmembers to the multiple listing service must be eliminat-
ed, although nonmembers may be charged a reasonable fee for
use of the service consistent with the per-capita costs of opera-
tion." 549 *P.2d* at 845, 130 *Cal.Rptr.* at 13. The court noted
that an association's freedom to exclude nonmembers from its
activities is not absolute, and must yield to the antitrust laws
when the association has market power and its activities corre-
spond directly with the business activities of its members. *Id.* at
843, 130 *Cal.Rptr.* at 11.

The Iowa Supreme Court recently addressed the question in
*State v. Cedar Rapids Board of Realtors,* 300 *N.W.2d* 127 (Iowa
1981). There, the Cedar Rapids Board of Realtors had developed
a multiple listing service exclusively for Board members. The
State filed an action under the Iowa Competition Act, which,
like the New Jersey Antitrust Act, is patterned after the Sher-
man Act. The State claimed that conditioning brokers' access to
the multiple listing service on Board membership was an unrea-

sonable restraint on trade. 300 *N.W.2d* at 129. Relying upon *Professional Engineers, supra,* the Court framed the crucial inquiry as being "[w]hether a restraint suppresses *competition* * * * *",* *id.,* not whether the agreement affords the parties thereto an edge over competitors. To this end, the court observed that:

> [t]he State's proposed solution would give a few competitors a monetary advantage over the MLS brokers whose organizing ability, money, and volunteer time has made the service a viable tool for effective selling. Judge Learned Hand's admonition is relevant: "The successful competitor, having been urged to compete, must not be turned upon when he wins." *United States v. Aluminum Co. of America,* 148 *F.2d* 416, 430 (2d Cir. 1945). [*Id.* at 129–30.]

The court concluded that "so long as Board membership is available to all on a nondiscriminatory basis as this record indicates, we will not compel this private trade association to share one of its membership benefits with brokers who, for whatever personal or business reasons, declined to join." *Id.* at 131.

Significantly, the Court in *Cedar Rapids* interpreted the *Marin County* decision as holding that it was the combination of two Board by-laws—denial of membership to part-time salesmen and denial of multiple listing service access to non-members—that unreasonably denied nonmembers access to the multiple listing service. We agree with that interpretation of *Marin County.*[8]

---

[8]In *People v. National Association of Realtors,* 120 *Cal.App.3d* 459, 174 *Cal.Rptr.* 728 (Ct.App.Cal.1981), a California Court of Appeals specifically declined to follow the *Cedar Rapids* court's interpretation of *Marin County.* *Id.* 174 *Cal.Rptr.* at 732. The court struck down as an illegal group boycott a realtor board rule that conditioned multiple listing service access on board membership. It described the *Marin County* decision as having "analyzed each restriction separately, found each to have anticompetitive effects far outweighing any possible business justification (the Rule of Reason test) and separately disapproved the MLS limitation for access to Board members only." *Id.* We view that conclusion as erroneous and agree with the *Cedar Rapids* interpretation that it was the combination of two Board by-laws that amounted to the antitrust violation. The following language from *Marin County* is particularly significant:

> We emphasize that the question before us concerns the validity of the "primarily engaged" rule *in conjunction with* other board bylaws effec-

■ Moreover, the reasoning of *Cedar Rapids* in assessing the competitive significance of the restraint in that case is persuasive. Where there are no exclusionary conditions attached to Realtor board membership, and there is no contention that the cost is prohibitively high, it is difficult to see any affront to competition. Although we agree that MCMLS has a substantial market impact on the residential real estate community in Monmouth County, it does not logically follow that the MCBR membership requirements stifle the free flow of competitive forces in that market. Further, there has been no showing that the elimination of the access rule will effect any pro-competitive benefits—that MCMLS participation will be less expensive or even remain the same, or that a greater number of brokers will thereby be able to achieve access. Absent any showing of a true denial of access, the defendants should not be required to dismantle or significantly alter a trade association that provides procompetitive benefits in excess of any anticompetitive effects engendered. Accordingly, we conclude that in conditioning MCMLS access on MCBR membership, defendants have created a reasonable restraint of trade—one not in violation of our Antitrust Act.

V

■ Defendants' motion for suppression of the brief and appendix of the *amicus curiae* is directed at the contents of the appendix, particularly the galley proofs of an article that later appeared at 11 *Seton Hall L.Rev.* 396 (1981). The article was written by the Deputy Attorney General who authored the *amicus* brief and testified as plaintiff's expert witness at trial. The appendix contains as well a variety of other material, including newspaper and magazine articles, the transcript of a hearing before the New Jersey Real Estate Commission at which the same Deputy Attorney General appeared as a witness,

tively denying employment to nonmember salesmen. [16 *Cal.*3d at 938 n.13, 549 *P.*2d at 844 n.13, 130 *Cal.Rptr.* at 12 n.13 (emphasis added).]

a portion of a brief submitted by the New Jersey Association of Realtors to the United States Supreme Court in an unrelated matter, and a copy of a consent decree likewise filed in another case.

No extended discussion is required to demonstrate the impropriety of the gratuitous inclusion of these materials in the Attorney General's filings. As for the law review article, it contains a statistical analysis of complaints filed against licensed real estate practitioners in New Jersey, which the trial court had refused to accept into evidence. Although the article as a whole may, as the Attorney General contends, transcend the present case, the fact remains that in including it in his appendix, the Attorney General has put before the Court evidence directly related to this case that was explicitly excluded by the trial court. The Attorney General argues that the article is "secondary source authority." This contention is just silly. The article is not the product of an independent and disinterested scholar. Its author not only wrote the Attorney General's brief but was plaintiff's expert at trial. In essence, by making his article a part of the record, he is offering to the Court as secondary source authority his comment on his own testimony at trial, as well as his view of defendants' case. The evidence contained in the appendix is clearly factual and evidential. As such, its inclusion amounts to a circumvention of the requirements of R. 1:5–5.

Accordingly, we have disregarded so much of the material in the appendix to the Attorney General's *amicus* brief as was not part of the record below, as well as all references to that material contained within the body of the brief. To that extent the motion is granted.

## VI

The judgment of the trial court is reversed. The cause is remanded to the Chancery Division for entry there of judgment in favor of defendants. No costs.

*For reversal and remandment*—Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD, SCHREIBER and HANDLER—5.

*For affirmance*—None.