STATE of Iowa, Appellant,

v.

CEDAR RAPIDS BOARD OF REALTORS, Appellee.

No. 64307.

Supreme Court of Iowa.

Jan. 14, 1981.

Thomas J. Miller, Atty. Gen., and John R. Perkins, J. Eric Heintz, and William F. Raisch, Asst. Attys. Gen., for appellant.

Ernest F. Pence of Hines, Pence, Day & Powers, Cedar Rapids, and Valentine A. Weber, Charles N. Besser and Michael A. Kahn of Reuben & Proctor, Chicago, Ill., for appellee.

Considered by REYNOLDSON, C. J., and HARRIS, McCORMICK, ALLBEE, and LARSON, JJ.

REYNOLDSON, Chief Justice.

In 1977 Attorney General Richard C. Turner, on behalf of the State, filed a petition alleging defendant Cedar Rapids Board of Realtors (Board) denied nonmembers access to its multiple listing service and thereby unreasonably restrained trade in violation of the Iowa Competition Law, section 553.4, The Code 1977.

Following trial commencing June 25, 1979, the district court held the State failed to meet its burden of proof, denied the

State's request for a permanent injunction against the Board, and dismissed the petition. The State appeals and we affirm.

The record before us discloses defendant Board is a voluntary, nonprofit trade association of real estate salespersons and brokers. The right to use the trademark "Realtor" is conferred upon Board members as a result of the Board's affiliations with the Iowa Association of Realtors and National Association of Realtors. Among the Board's services to its members is a multiple listing service (MLS). When authorized by property owners, MLS participants report new listings to a central office. Each week a book of new listings is distributed to all MLS subscribers. Daily "hot sheets" keep the book current. A quarterly MLS publication reports on properties that have been sold or removed from the market.

Subscribers pay an initiation fee ($500) and a monthly charge ($29 per listing book) for MLS service. Only Board members are eligible to subscribe. In its decree trial court found among other things that "Board membership criteria are reasonable ..." and that "[n]o one is arbitrarily or unreasonably excluded from Board membership and the concomitant right to participate in the MLS." The court held the Board's "rule against non-member MLS participation is lawful."

■ As in all equity cases, our review is de novo. Accordingly, we give weight to the fact-findings of the trial court without being bound by them. *See* Iowa R.App.P. 14(f)(7). We must apply two relevant statutes:

Section 553.4, The Code:

A contract, combination, or conspiracy between two or more persons shall not restrain or monopolize trade or commerce in a relevant market.

Section 553.2, The Code:

This chapter shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose as this chapter. This construction shall not be made in such a way as to constitute a delegation of state authority to the federal government, but shall be made to achieve uniform application of the state and federal laws prohibiting restraints of economic activity and monopolistic practices.

■ The State's brief concedes that "[s]ince the Iowa statute is to be construed to complement similar federal laws, an examination of the federal statutes and case law is necessary, in the absence of any Iowa case law on point." This examination reveals the Iowa Competition Act is the progeny of the Sherman Act, 15 U.S.C. § 1, *et seq.* (1964). The Sherman Act proscribes not all restraints of competition but only "undue restraint[s] of the course of trade." *Standard Oil Co. v. United States*, 221 U.S. 1, 61, 31 S.Ct. 502, 516, 55 L.Ed. 619, 645 (1911). The test for gauging whether a restraint is undue or unreasonable is the "rule of reason," which Justice Brandeis applied in *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683, 687 (1918):

Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.

To scrutinize a restraint's "reasonableness" we examine

the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

*Id.* at 238, 38 S.Ct. at 244, 62 L.Ed. at 687.

■ Real estate brokers and salespersons earn a commission by finding willing and able buyers for the real property listed by their principals, the sellers. Prospective buyers seek out brokers, thus the MLS arrangement can create a subagent relation-

ship (acquiesced in by the seller when he or she agrees to the listing) between the broker who knows a potential buyer and the listing broker. Indeed,

> [f]rom very early times it has been the custom for men engaged in the occupation of buying and selling articles of a similar nature at any particular place to associate themselves together. The object of the association has in many cases been to provide for the ready transaction of the business of the associates by obtaining a general headquarters for its conduct, and thus to insure a quick and certain market for the sale or purchase of the article dealt in.

*Anderson v. United States*, 171 U.S. 604, 616, 19 S.Ct. 50, 54, 43 L.Ed. 300, 306 (1898).

Such an association resulted in the Cedar Rapids Board of Realtors, which in turn developed an MLS for its members. The record developed in this case reflects that as a direct result, more brokers were aware of more properties for sale. The "inventory" of each MLS subscriber grew. Sellers realized greater exposure. Buyers learned more about more properties with less investment of time. Wider dissemination of vital information enhanced possibilities for brokers to bring buyers and sellers together. For example, Realtor Donahue testified that in exchange for $1,000.00 in Board and MLS membership fees "the one man office ... the new guy coming in ... end[s] up with hundreds and hundreds of property inventory ... to sell .... In other words, even a one man or two man or three man office has the same amount of property as a seventy-five man office down the street."

The State contends such testimony confirms nonmember access to the MLS is "necessary for them to effectively compete with member brokers in the Linn County residential real estate market." From this premise the State argues "the fact that membership in the Cedar Rapids Board is required at all for nonmember access to the MLS, a tool necessary to compete effectively, is a restraint of trade in violation of the Iowa Competition Law." This rationale misapplies the "rule of reason" case law.

Here, the State charges a *per se* violation of alleged restraints, which it concedes elsewhere in its brief should be judged in "a balancing test" against a standard of reasonableness.

■ Whether a restraint suppresses *competition* is material. *See National Society of Professional Engineers v. United States*, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637, 650 (1978); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568, 580 (1977). That the agreement might give the parties to it an edge over *competitors* is not. *Anderson v. United States*, 171 U.S. at 618–19, 19 S.Ct. at 55, 43 L.Ed. at 306–07; *United States v. Associated Press*, 52 F.Supp. 362, 369 (S.D.N.Y.1943), *aff'd*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) ("a combination may be within its rights, although it operates to the prejudice of outsiders whom it excludes"). "The legislative history [of the federal antitrust statute that spawned the Iowa Competition Law] illuminates congressional concern with the protection of *competition*, not *competitors* ...." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510, 533 (1962).

The alleged evil the State identifies is that a few Linn County brokers—two were produced at trial—want access to the MLS without the "unnecessary barrier" of Board membership. The remedy sought is removal of "the price of admission to a nonrelated activity," i. e., Board membership and fees, because one broker testified MLS access is an "economic necessity." This same broker, after testifying his $232,000 sales volume was only 20 percent of what he might sell as an MLS participant, was at a loss to explain why he would not invest $500 (initial Board membership fees) for this economic necessity. The State's proposed solution would give a few competitors a monetary advantage over the MLS brokers whose organizing ability, money, and volunteer time has made the service a viable tool for effective selling. Judge Learned Hand's admonition is relevant: "The successful competitor, having been urged to

compete, must not be turned upon when he wins." *United States v. Aluminum Co. of America*, 148 F.2d 416, 430 (2d Cir. 1945).

A different case would be presented if brokers were unreasonably denied membership on the Board and, consequently, access to the MLS. But here, unlike the government in *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1358 (5th Cir. 1980), the State conceded the membership requirements of the Board were reasonable. Yet the State spotlights *Associated Press* as "the best guidance" on particular agreements that unreasonably restrain competition.

In *Associated Press*, the organizational bylaws severely restricted membership. An existing member could block the membership application of a competitor. 326 U.S. at 10, 65 S.Ct. at 1420, 89 L.Ed. at 2025. Without the consent of the competitor, the applicant could gain membership only upon several conditions, including a majority vote of some 1200 AP members. *Id.* at 9, 11, 65 S.Ct. at 1419–20, 89 L.Ed. at 2024–25. In addition, AP members could not trade or sell their news stories to nonmembers. *Id.* at 9, 65 S.Ct. at 1419, 89 L.Ed. at 2024.

The United States Supreme Court affirmed Judge Hand's injunction against the discriminatory use of these bylaws, which constituted an illegal restraint of competition. *Id.* at 12, 65 S.Ct. at 1421, 89 L.Ed. at 2026. Significantly, the Court also affirmed the district court holding that AP need not serve nonmember applicants to comply with antitrust laws. *Id.* at 21–23, 65 S.Ct. at 1425–26, 89 L.Ed. at 2031–32. Thus, an association may lawfully limit its services and facilities to its members. *Id.*, 65 S.Ct. at 1425–26, 89 L.Ed. at 2031–32.

The Eighth Circuit succinctly noted the separate holdings in *Associated Press* :

> The Court, in group boycott language, struck down the bylaws of A.P. which restricted membership solely because the applicant was a competitor of an existing member. With regard to the other bylaw, however, forbidding A.P. members to sell local news to nonmembers, an excellent example of a concerted refusal to

deal, the Supreme Court did not strike down that prohibition.

*Worthen Bank & Trust Co. v. National BankAmericard Inc.*, 485 F.2d 119, 128 (8th Cir. 1973), *cert. denied*, 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974) (Bylaws that prevented a card-issuing member from becoming a card-issuing member of another national bank credit card system was not a per se antitrust violation; at trial, "rule of reason" must be applied.).

Unlike the refusal to deal upheld in *Associated Press*, here the record reflects extensive cooperation between MLS members and nonmember brokers. Brokers called by both parties testified Board members cooperate with nonmembers on the sale of MLS listed properties by nonmembers and the sale of non-MLS listed property by Realtors.

Plaintiff's reliance on state court decisions that hold restricting MLS access to Board members is an unlawful anticompetitive practice is unwarranted. These cases are easily distinguished from the one before us. For example, in *Marin County Board of Realtors, Inc. v. Palsson*, 16 Cal.3d 920, 549 P.2d 833, 130 Cal.Rptr. 1 (1976), the California Supreme Court held the combination of two Board bylaws unreasonably denied nonmembers access to the Board's MLS. *Id.* at 924, 549 P.2d at 834, 130 Cal.Rptr. at 2. Palsson was a part-time real estate salesman. State law forbade him from practicing without being employed by or associated with a licensed broker. *Id.* at 925 & n.2, 549 P.2d at 835 & n.2, 130 Cal.Rptr. at 3 & n.2. One Board bylaw denied membership to licensed salespersons or brokers not "primarily engaged in the real estate business." *Id.* at 924, 549 P.2d at 835, 130 Cal.Rptr. at 3. Another bylaw prohibited Board member brokers from hiring nonmembers. *Id.*, 549 P.2d at 835, 130 Cal.Rptr. at 3. A third precluded dissemination of published MLS listings to nonmembers. *Id.*, 549 P.2d at 834, 130 Cal.Rptr. at 3. Thus a part-time salesman denied membership on the Board and access to the MLS was also denied employment with the 75 percent of the residential brokers in Marin County who were

Realtors. *Id.* at 924–25, 549 P.2d at 834–35, 130 Cal.Rptr. at 2–3.

The court observed that

trade associations may perform beneficial services for their members and society .... In the course of providing these benefits, the associations often exclude nonmembers. But such exclusion, unless directly aimed at eliminating competition, can rarely be said to be so inherently destructive or so devoid of any discernible benefit that the courts must condemn the policy without exploring its effects or the underlying rationale.

*Id.* at 933–34, 549 P.2d at 841, 130 Cal.Rptr. at 9.

In enjoining the Realtors from denying access of nonmembers to the MLS, the *Palsson* court defined its holding in a footnote: "We emphasize that the question before us concerns the validity of the 'primarily engaged' rule *in conjunction with* other board bylaws effectively denying employment to nonmember salesmen." *Id.* at 938 n.13, 549 P.2d at 844 n.13, 130 Cal.Rptr. at 12 n.13 (emphasis supplied).

Applying the "rule of reason," the district court below found the evidence submitted showed "the Board's membership criteria are reasonable and its rule against nonmember MLS participation is lawful." We agree. The State as plaintiff in this antitrust action failed to carry its burden to prove the Board's rule—denial of MLS access to nonmembers—unreasonably "restrain[ed] or monopolize[d] trade or commerce in a relevant market," section 553.4, The Code, thereby lessening competition. *See Brown Shoe Co.*, 370 U.S. at 319–21, 82 S.Ct. at 1521, 8 L.Ed.2d at 532–33.

So long as Board membership is available to all on a nondiscriminatory basis as this record indicates, we will not compel this private trade association to share one of its membership benefits with brokers who, for whatever personal or business reasons, declined to join. Costs are taxed to the State, provided, however, that the printing costs for the Board's brief, certified at $2931.40 for a 49-page brief, shall be taxed at $147.

The judgment of the district court is affirmed.

AFFIRMED.