[Civ.No. 49910. First Dist., Div. One. Oct. 14, 1982.]

JOEL DERISH et al., Plaintiffs and Appellants, v.
SAN MATEO-BURLINGAME BOARD OF REALTORS et al.,
Defendants and Respondents.

COUNSEL

David Barry, Steven Finley and Barry & Finley for Plaintiffs and Appellants.

Moses Lasky, John E. Munter, Terry M. Gordon and Lasky, Haas, Cohler & Munter for Defendants and Respondents.

## OPINION

**RACANELLI, P. J.**—In this appeal, we are asked to decide whether access to a multiple listing service maintained by a board of realtors must be extended to members of the public. For the reasons which follow, we conclude that it is not improper to deny access to persons who are not licensed real estate brokers or sales agents.

### FACTS

Appellants are homeowners who sought to sell their home and to buy a new one. Accordingly, they engaged the services of a real estate sales agent who was employed by H. Kent Atwater Realtor, a licensed real estate broker.

Appellants entered into a listing agreement, listing their house for sale at $62,950. Subsequently, the agent assisted in consummation of the sale for $63,000 upon which appellants paid an agreed commission of $3,780. In addition, the sales agent located a new house for appellants and assisted in consummation of the purchase.

Thereafter, appellants brought suit against Atwater, the San Mateo-Burlingame Board of Realtors, the California Association of Realtors and the National Association of Realtors claiming antitrust law violations.[1] Defendants' demurrer was sustained without leave to amend and judgment of dismissal was entered. This appeal ensued.

The 10 causes of action of the second amended complaint,[2] though framed in various theories, may be reasonably condensed to an assertion that appellants, as members of the public and unlicensed as real estate brokers or salespersons, should have been allowed access to the local board's multiple listing service (MLS). The alleged consequences of the board's rule restricting public access are twofold: (1) In order to make known their desire to sell property or to learn of properties for sale, appellants were obliged to engage a broker and thus pay a commission; (2) the broker's commission rates are withheld from the public thus hindering competition among brokers with respect to commission rates; appellants argue that they were thereby compelled to pay a higher commission than necessary had they been afforded access to the published MLS commission rates. The effect of such restrictive policy, it is contended, is condemnable as unlawful price-fixing, a group boycott, restraint of trade, monopolization, and fraud.

## I.

■ Alleged anticompetitive activity is generally analyzed under one of two standards: either it is condemned automatically as a per se violation of the antitrust law; or it is evaluated under the "rule of reason" to determine the degree of harm relative to the business justification. The latter test—the "rule of reason"—is applied where the practice is not "plainly anticompetitive." (*Broadcast Music, Inc.* v. *CBS*

---

[1]We have been informed that a nearly identical lawsuit has been filed in federal district court raising similar claims under federal antitrust law. Inasmuch as respondents have not raised an issue in this regard, we make no ruling on whether appellants are entitled to "two bites of the apple."

[2]The second amended complaint actually contains 11 causes of action. Appellants conceded at oral argument that the demurrer was properly sustained as to the first count alleging price-fixing in the contract between the real estate broker and his salesperson. Accordingly, we do not discuss that abandoned theory.

(1979) 441 U.S. 1 [60 L.Ed.2d 1, 99 S.Ct. 1551]; *Continental T.V., Inc.* v. *GTE Sylvania, Inc.* (1977) 433 U.S. 36, 49-50 [53 L.Ed.2d 568, 579-580, 97 S.Ct. 2549]; *Standard Oil Co.* v. *United States* (1911) 221 U.S. 1, 55 [55 L.Ed. 619, 643, 31 S.Ct. 502].)

■ With respect to the alleged "secret" publication of commission rates, we note that appellants make no claim of an agreement among brokers to adhere to a fixed rate schedule; appellants allege merely that the exclusive exchange of information between brokers concerning commission rates is unlawful. We disagree.

■ The exchange of price data and other information among competitors is not a per se violation of the antitrust law. Where the exchange increases the economic efficiency and renders the market more competitive, it may be found valid under the rule of reason. (*Maple Flooring Assn.* v. *United States* (1925) 268 U.S. 563, 578-586 [69 L.Ed. 1093, 1100-1104, 45 S.Ct. 578].)

■ A multiple listing service is a cooperative arrangement by real estate brokers through local boards for the pooling of listings—the sharing of information about properties for sale so that all subscribers to the service may have an opportunity to act as subagents in procuring a buyer. (See generally *Marin County Bd. of Realtors, Inc.* v. *Palsson* (1976) 16 Cal.3d 920, 924 [130 Cal.Rptr. 1, 549 P.2d 833]; *Korstad* v. *Hoffman* (1963) 221 Cal.App.2d Supp. 805, 808-809 [35 Cal.Rptr. 61]; 1 Miller & Starr, Current Law of Cal. Real Estate (1975) § 2:14, p. 191.) By serving as a central depository for listings, the MLS helps reduce information barriers and overcome geographical logistics. It aids the seller by allowing a preferential choice of broker while at the same time enabling the seller to reach a larger market by exposing the property offered for sale to all subscribers of the service. Simultaneously, it aids the prospective buyer by providing access to a broader selection of properties. It assists the listing broker by providing wider exposure for his listings, and likewise aids the procuring broker in providing a larger inventory of properties. (See Austin, *Real Estate Boards and Multiple Listing Systems as Restraints of Trade* (1970) 70 Colum.L.Rev. 1325, 1353-1354.)

The effects of the information exchange through the MLS have been characterized as "enormously procompetitive." (*United States* v. *Realty Multi-List, Inc.* (5th Cir. 1980) 629 F.2d 1351, 1368; to the same effect *State* v. *Cedar Rapids Bd. of Realtors* (Iowa 1981) 300 N.W.2d 127, 129; *Grillo* v. *Bd. of Realtors of Plainfield Area* (1966) 91 N.J.Super. 202 [219 A.2d 635, 644]; *Grempler* v. *Multiple Listing Service Bur. of*

*Harford Co., Inc.* (1970) 258 Md. 419 [266 A.2d 1, 3, 45 A.L.R.3d 180]; *Pomanowski* v. *Monmouth Cty. Bd.* (1982) 89 N.J. 306 [446 A.2d 83].)

Moreover, the users of a MLS are not truly competitors. The ultimate purpose of the information exchange is the formation of a subagency relationship between the listing broker and the cooperating broker. (See *State* v. *Cedar Rapids Bd. of Realtors, supra,* 300 N.W.2d 127, 128-129.) "[J]ust as the seller and listing broker are entitled to know the rate of commission involved in order to decide if they will enter into an agency relationship, potential cooperating brokers are similarly entitled to information concerning the rate of commission . . . in order to decide whether a subagency relationship should be established." (*Murphy* v. *Alpha Realty, Inc.* (N.D. Ill. 1978) 1978-2 Trade Cases ¶ 62,388.)

We therefore conclude that the exchange of information in the MLS does not violate the antitrust law.

■ In any event, we observe that the crux of appellants' complaint is not that information was exchanged, but that the information was kept "secret" from the public. We now consider that central issue.

The antitrust implications of restricted access to a MLS were examined by our Supreme Court in *Marin County Bd. of Realtors, Inc.* v. *Palsson, supra,* 16 Cal.3d 920, where the policy of the Marin County Board of Realtors was to deny MLS access *to licensed brokers* who were not members of the board. Palsson, a licensed real estate salesman, was denied membership in the board because he was engaged in the real estate business only part time. The court held the membership requirement—that persons be "primarily engaged" in real estate—violated the state antitrust laws as did the limitation on access to the MLS to member licensees.

In disapproving the board's limited access rule, the *Palsson* court recognized that the primary objective of the rule is not the destruction of particular brokers or of nonmember brokers as a class. Accordingly, the court held the rule was not per se unlawful, but would be examined under the "rule of reason," analyzing the economic effects in light of possible justifications for the practice. (P. 934.) Under such analysis the court concluded that the access rule "seriously hampers the competitive effectiveness of nonmember *licensed brokers and salesmen.*" (P. 936; italics added.) The court recognized that the primary rationale for denying access to nonmembers was to provide an attractive benefit to the board's own members. (*Id.,* at p. 937.) But the court ultimately

concluded that on balance "access to the multiple listing service is so essential to nonmembers if they are to compete effectively that such access must be granted to *all licensed salesmen and brokers* who choose to use the service." (*Id.*, at p. 938; italics added.) Accord *People* v. *National Association of Realtors* (1981) 120 Cal.App.3d 459, 467-468 [174 Cal.Rptr. 728]; *Glendale Bd. of Realtors* v. *Hounsell* (1977) 72 Cal.App.3d 210 [139 Cal.Rptr. 830].)

Appellants seek to extend the rule of *Palsson* to compel the granting of access to anyone who wishes to use the MLS. But, we find nothing in *Palsson* which suggests that denial of access to the MLS to *unlicensed* members of the general public is to be similarly viewed as a violation of the state antitrust law.[3]

Sound reasons exist in support of limiting the MLS to licensed professionals. All persons employed in the real estate industry are extensively regulated by a comprehensive statutory scheme. (Bus. & Prof. Code, §§ 10130-10483.) Under that scheme, all persons acting as real estate brokers or sales agents must be licensed (Bus. & Prof. Code, §§ 10130-10139); a real estate salesman must be employed by a licensed broker. (Bus. & Prof. Code, § 10132.) Although persons acting pro se on behalf of their own property interests are exempt from the licensing requirements (Bus. & Prof. Code, § 10133, subd. (a)), it is clear that the Legislature has provided specific professional qualifications applicable to persons intending to engage in real estate activities. Were this court to determine that any member of the general public may participate in a MLS, the Legislature's attempt to assure standards of competence in the field would be seriously undermined.[4] (See *Collins* v. *Main Line Board of Realtors, supra,* 452 Pa. 342 [board's stringent membership requirements usurped state's licensing authority].)

---

[3]A number of courts in other jurisdictions have ruled on the question of access to a MLS. But, like *Palsson,* those cases have involved access by *licensed* real estate brokers. (E.g., *United States* v. *Realty Multi-List, Inc., supra,* 629 F.2d 1351; *Pomanowski* v. *Monmouth Cty. Bd., supra,* 89 N.J. 306; *Blake* v. *H-F Group Multiple Listing Service* (1976) 36 Ill.App.3d 730 [345 N.E.2d 18]; *Grempler* v. *Multiple Listing Service Bur. of Harford Co., Inc., supra,* 258 Md. 419; *Collins* v. *Main Line Board of Realtors* (1973) 452 Pa. 342 [304 A.2d 493], cert. den., 414 U.S. 979 [38 L.Ed.2d 223, 94 S.Ct. 291]; *State* v. *Cedar Rapids Bd. of Realtors, supra,* 300 N.W. 2d 127.)

[4]We note that while this matter was on appeal, the Legislature enacted sections 1086-1090 of the Civil Code which expressly contemplate that only *licensed* real estate personnel will have access to a MLS. The statute defines a MLS as a "facility of cooperation of *agents,* operating through an intermediary . . ., through which *agents* establish express or implied legal relationships with respect to listed properties." (Italics added.) An "agent" is defined as "one authorized by law to act in that capacity for that type of property *and is licensed* as a real estate broker . . . or *is a licensee. . . .*" (Italics added.) (Stats. 1982 ch. 547, § 1; Civ. Code §§ 1087, 1086, subd. (d).)

Moreover, the primary objective of the MLS is the formation of a subagency relationship between the listing broker and a cooperating, procuring broker. Without some assurance that those who list properties in a MLS and perform the vital function of subagents in accordance with exacting professional standards, neither broker would be encouraged to use the service and the procompetitive benefits of the MLS would be lost. (*United States* v. *Realty Multi-List, Inc., supra,* 629 F.2d 1351, 1369, 1377-1380; cf. *E. A. McQuade Tours, Inc.* v. *Consolidated Air Tour Man. Com.* (5th Cir. 1972) 467 F.2d 178, 188, cert. den. 409 U.S. 1109 [34 L.Ed.2d 690, 93 S.Ct. 912] [exclusion from industry-wide tour guide manual].)

The purpose of the antitrust laws " '. . . is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights *by those engaged, or who wish to engage, in trade and commerce*—in a word to preserve the right of freedom to trade.' " (*Associated Press* v. *United States* (1945) 326 U.S. 1, 14, fn. 12 [89 L.Ed. [2013, 2027, 65 S.Ct. 1416] [news agency may not simultaneously restrict membership and deny news access to nonmembers]; italics added.) In the case at bench, appellants are neither licensed as real estate brokers nor persons engaged in the real estate brokerage business; nor do they allege harm to those who are. Instead, appellants complain only that in their personal transaction of selling and buying their home, they were denied access to the MLS.

In a recent decision, a licensed real estate broker who was "forced" to pay fees to a number of boards in order to gain access to a broad spectrum of MLS's, filed an antitrust action challenging the several boards' requirement for payment of fees to use the MLS. The court found no antitrust violation, reasoning as follows: "Where the rule of reason applies, the plaintiff has the burden of proving that defendant's restrictive trade practices have substantial or serious anticompetitive effects within the relevant market. [Citations.] Plaintiff must show the defendant's trade practices amount to monopolistic powers seriously hindering competitors. A showing of only individual detriment is insufficient as the purpose of antitrust laws is primarily to protect the consuming public by healthy competition, and only secondarily to protect the individual competitor. . . . [¶] In contrast, the complaint here alleges only that the requirements for participation in the several listing services adversely affect plaintiff individually because he conducts a real estate business on a state-wide basis and cannot afford the participation fees of all the boards. Lacking are any material allegations to the effect that defendants' listing services amount to a monopoly or that a competitive market to which plaintiff belongs is seriously hampered by MLS

participation requirements. Plaintiff's failure to allege any harm to the public constitutes a failure to state an antitrust cause of action. [Citation.]'' (*Feldman* v. *Sacramento Bd. of Realtors, Inc.* (1981) 119 Cal.App.3d 739, 747-748 [174 Cal.Rptr. 231]; accord *United Multiple Listing Service, Inc.* v. *Bernstein* (1982) 134 Cal.App.3d 486 [184 Cal.Rptr. 465] [board's regulation requiring members to submit disputes to arbitration did not violate antitrust laws].)

The present case is closely analogous. Appellants' sole complaint is that the sale and purchase of their homes were made more expensive because they were ''forced'' to employ a broker. But they fail to allege any harm which might give rise to an antitrust cause of action.

## II.

We similarly find no merit in plaintiffs' allegations of fraud stemming from the refusal of the real estate agent to make the MLS available to them. Appellants' agreement with the agent was that the agent would show them ''homes which best met plaintiffs' needs.'' The obligation of the agent was to exercise professional judgment in selecting potential homes for consideration. The singular circumstance that appellants are dissatisfied with the agent's judgment does not support an action for fraud. (E.g., *Pacesetter Homes, Inc.* v. *Brodkin* (1970) 5 Cal.App.3d 206, 210-213 [85 Cal.Rptr. 39] [expression of opinion is not a misrepresentation]; see generally 4 Witkin, Summary of Cal. Law, Torts, § 447, pp. 2711-2712 [no justifiable reliance on mere assertion that item is the ''best''].)

The judgment is affirmed.

Elkington, J., and Newsom, J., concurred.

A petition for a rehearing was denied November 10, 1982, and the opinion was modified to read as printed above. Appellants' petition for a hearing by the Supreme Court was denied December 22, 1982. Bird, C. J., was of the opinion that the petition should be granted.