# IN THE SUPREME COURT OF IOWA

No. 13–1872

Filed February 27, 2015

Amended June 5, 2015

**STEVEN A. MUELLER, BRADLEY J. BROWN, MARK A. KRUSE, KEVIN D. MILLER,** and **LARRY E. PHIPPS,** on Behalf of Themselves and Those Like Situated,

    Appellants,

vs.

**WELLMARK, INC.** d/b/a **WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA,** an Iowa Corporation, and **WELLMARK HEALTH PLAN OF IOWA, INC.,** an Iowa Corporation,

    Appellees.

---

Appeal from the Iowa District Court for Polk County, Robert A. Hutchison, Judge.

Plaintiff chiropractors appeal from a summary judgment entered by the district court in favor of defendant health insurers on per se antitrust claims under the Iowa Competition Law. **AFFIRMED.**

Glenn L. Norris of Hawkins & Norris, P.C., Des Moines; Harley C. Erbe of Erbe Law Firm, Des Moines; Steven P. Wandro, Michael R. Keller, and Shayla L. McCormally of Wandro & Associates, P.C., Des Moines, for appellants.

Hayward L. Draper and Ryan G. Koopmans of Nyemaster Goode, P.C., Des Moines, for appellees.

**MANSFIELD, Justice.**

Wellmark, Inc. is an Iowa-based health insurer that belongs to the national Blue Cross and Blue Shield (BCBS) network. Wellmark has contracted with health care providers in Iowa to provide services at certain reimbursement rates. By agreement, Wellmark makes those rates available both to self-insured Iowa plans that it administers and to out-of-state BCBS affiliates when those entities provide coverage for services provided in Iowa.

This appeal presents the question whether the foregoing agreements between Wellmark and self-insuring employers and between Wellmark and out-of-state BCBS affiliates amount to per se violations of Iowa antitrust law. We conclude they do not. These arrangements are not the simple horizontal conspiracies that historically have qualified for per se treatment. Accordingly, and recognizing that the plaintiffs stipulated they were proceeding *only* under a per se theory and not under the rule of reason, we affirm the district court's grant of summary judgment to Wellmark.

## I. Background Facts and Proceedings.

This case comes before us for the second time. *See Mueller v. Wellmark, Inc.*, 818 N.W.2d 244 (Iowa 2012).

Approximately seven years ago, a number of Iowa chiropractors sued Wellmark, the largest health insurer in Iowa, in the Polk County District Court. The suit challenged Wellmark's reimbursement rates and practices for chiropractic services and asked for class action certification. One count of the plaintiffs' petition sought relief under a variety of Iowa insurance statutes. *Mueller*, 818 N.W.2d at 249 (noting plaintiffs sought relief based upon allegations Wellmark engaged in discriminatory practices in violation of Iowa Code sections 509.3(6), 514.7, 514.23(2),

514B.1(5)(*c*), 514F.2 (2007)). Another count pled that Wellmark had entered into a contract, combination, or conspiracy in violation of section 553.4 of the Iowa Competition Law, the counterpart to section 1 of the Federal Sherman Antitrust Act. *Id.*; *see also* 15 U.S.C. § 1 (2006). A third count alleged that Wellmark had abused monopoly power in violation of section 553.5 of the Iowa Competition Law, the counterpart to section 2 of the Sherman Act. *Mueller*, 818 N.W.2d at 249; *see also* 15 U.S.C. § 2.

On Wellmark's motion, the district court dismissed the claims based on the insurance statutes. *Mueller*, 818 N.W.2d at 250. It found no private cause of action was available under those laws. *Id.* The district court later granted summary judgment to Wellmark on the antitrust claims. *Id.* at 252. This ruling was primarily based on the "state action" exemption in the Iowa Competition Law. *Id.*; *see also* Iowa Code § 553.6(4) (providing that the Iowa Competition Law "shall not be construed to prohibit . . . activities or arrangements expressly approved or regulated by any regulatory body or officer acting under authority of this state"). Plaintiffs appealed. *Mueller*, 818 N.W.2d at 253.

On appeal, we affirmed the dismissal of the claims under Iowa insurance law. As we explained,

> [O]ur legislature chose to provide the Iowa Insurance Commissioner with exclusive powers to regulate health insurance practices under these statutes. For these reasons, we hold Iowa Code sections 509.3(6), 514.7, 514.23(2), 514B.1(5)(*c*), and 514F.2, enacted as part of H.F. 2219, do not create a private cause of action.

*Id.* at 258.

However, we found that the state action exemption did not insulate Wellmark's reimbursement rates from antitrust review. We noted,

These regulations [cited by Wellmark] are not directed to the regulation of rate differentials for particular services. Their purpose, rather, is to insure that health insurers do not abuse their overall relationship with patients and providers through the use of preferred provider plans. Thus, if a clinic decided to sue Wellmark under the Iowa Competition Law alleging that Wellmark had engaged in prohibited section 553.5 monopolization by excluding it from a preferred provider arrangement, the section 553.6(4) state action exemption might well apply. But, it does not appear that the legislature has decided generally to remove the setting of reimbursement rates by health insurance companies from the operations of the marketplace or from claims under the Iowa Competition Law.

*Id.* at 262 (footnote omitted). Yet, we affirmed the dismissal of some of the chiropractors' antitrust claims, including the Iowa Code section 553.5 monopolization claim, on alternate grounds that had been raised by Wellmark. *Id.* at 264–66. Still, with respect to the section 553.4 conspiracy claim, "we reverse[d] the district court's summary judgment granting Wellmark a blanket exemption under section 553.6(4) from charges that it engaged in anticompetitive price-fixing or term-fixing schemes." *Id.* at 264.

On remand, the plaintiffs stipulated that their only remaining antitrust claims—alleging conspiracies between Wellmark and out-of-state BCBS affiliates and between Wellmark and self-funding employers that hired Wellmark to administer their plans—were being asserted on a per se theory. As the plaintiffs stated,

Plaintiffs hereby agree and stipulate that the only violation of Iowa Code § 553.4 alleged in the Fourth Amended and Substituted Petition for Damages is for a contract, combination or conspiracy between the Defendants and (1) out-of-state Blues and (2) in-state self-funded employers through administration contracts, to price fix by establishment of a maximum price for services of Iowa chiropractors in Wellmark's provider network or through the use of a restrictive or capitated payment system in Wellmark's HMO; and those alleged price fixing conspiracies are alleged to violate Iowa Code § 553.4 based on Plaintiffs' contention that they constitute *per se* violations of the Iowa

Competition Act. Plaintiffs' allegations exclude a contention that a rule of reason analysis is applicable to the violation of Iowa Code § 553.4 alleged in the Fourth Amended and Substituted Petition.

Thereafter, Wellmark moved for summary judgment again, this time on the ground that neither of these alleged conspiracies was subject to per se treatment. As Wellmark put it, "Sharing a provider network does not amount to naked price fixing and is not subject to the *per se* rule." Wellmark urged that plaintiffs' claims were potentially viable, if at all, only under the rule of reason.

The summary judgment record revealed that employers wanting to provide group health insurance to their employees can contract with Wellmark in one of two ways. Either way, Wellmark makes its provider network available at established reimbursement rates and handles claims administration. However, if the employer self-insures, then the employer is financially responsible for claims. On the other hand, when Wellmark acts as an insurer in addition to a claims administrator, then the employer pays premiums to Wellmark, and Wellmark must bear the financial risk of the resulting claims.

The record also disclosed that Wellmark, which is the BCBS licensee in Iowa and South Dakota, has a BlueCard® program with BCBS licensees in other states. Under this arrangement, those out-of-state licensees have access to Wellmark's provider network in Iowa at the rates negotiated by Wellmark whenever they have to pay Iowa claims. Likewise, Wellmark has access to the other licensees' negotiated provider networks in their respective states at their rates whenever Wellmark has to pay claims in those states. *See Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of R.I.*, 997 F. Supp. 2d 142, 150 n.3 (D.R.I. 2014)

(describing the BlueCard® program); *Solomon v. Blue Cross & Blue Shield Ass'n,* 574 F. Supp. 2d 1288, 1289 (S.D. Fla. 2008) (same).

The plaintiffs maintained that Wellmark had engaged in per se price-fixing when it entered into agreements with self-insuring Iowa employers to make its network and claims administration available to them. Similarly, the plaintiffs urged that Wellmark had engaged in per se price-fixing when it participated in the national BlueCard® program under which BCBS entities agreed to make their in-state networks available to each other when their respective customers needed out-of-state services.

After hearing the parties' arguments, the district court rejected plaintiffs' per se theories and entered summary judgment for Wellmark. This appeal followed.

## II.  Standard of Review.

This court reviews grants of summary judgment for correction of errors at law. *Mueller,* 818 N.W.2d at 253. Whether the per se rule or the rule of reason applies to a given practice is a question of law. *See California ex rel. Harris v. Safeway, Inc.,* 651 F.3d 1118, 1124 (9th Cir. 2011) (citing XI Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1909b, at 279 (2d ed. 2005)); *Nat'l Bancard Corp. v. VISA U.S.A., Inc.,* 779 F.2d 592, 596 (11th Cir. 1986).

## III.  Legal Analysis.

**A. The Iowa Competition Law.**  The general assembly has directed that the Iowa Competition Law "shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose." Iowa Code § 553.2. As the legislature has stated,

> This construction shall not be made in such a way as to constitute a delegation of state authority to the federal government, but shall be made to achieve uniform application of the state and federal laws prohibiting restraints of economic activity and monopolistic practices.

*Id.*

Accordingly, in the past, when interpreting the Iowa Competition Law, we have generally adhered to federal interpretations of federal antitrust law. *See Next Generation Realty, Inc. v. Iowa Realty Co.*, 686 N.W.2d 206, 208 (Iowa 2004) (per curiam); *Max 100 L.C. v. Iowa Realty Co.*, 621 N.W.2d 178, 181–82 (Iowa 2001); *Fed. Land Bank of Omaha v. Tiffany*, 529 N.W.2d 294, 296–97 (Iowa 1995); *Neyens v. Roth*, 326 N.W.2d 294, 297 (Iowa 1982); *State v. Cedar Rapids Bd. of Realtors*, 300 N.W.2d 127, 128 (Iowa 1981). In *Comes v. Microsoft Corp.*, we declined to follow federal precedent on whether indirect purchasers had standing to sue under the Iowa Competition Law. 646 N.W.2d 440, 445–49 (Iowa 2002). We did so because: (1) the language of the relevant provision (Iowa Code section 553.12 (1997)) supported indirect purchaser standing; (2) uniformity only requires a uniform standard of conduct under state and federal law, not a uniform rule as to who may sue; and (3) most federal courts allowed indirect purchasers to sue at the time the Iowa Competition Law was enacted in 1976. *See id.*

This case involves section 553.4 of the Iowa Competition Law. It provides, "A contract, combination, or conspiracy between two or more persons shall not restrain or monopolize trade or commerce in a relevant market." Iowa Code § 553.4 (2007). This provision of the Iowa Competition Law is the counterpart to section 1 of the Sherman Act, which states, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15

U.S.C. § 1. The wording of the two provisions is notably similar. If anything, the Iowa Competition Law tilts more in the direction of an economics-based approach to antitrust, since it condemns only those contracts, combinations, and conspiracies that restrain trade "in a relevant market"—a distinctly economic concept. Iowa Code § 553.4; *see, e.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563, 587, 86 S. Ct. 1698, 1712, 16 L. Ed. 2d 778, 795 (1966) (Fortas, J., dissenting) (noting that "the search for 'the relevant market' must be undertaken and pursued with relentless clarity" and "is, in essence, an economic task put to the uses of the law"); *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362, 83 S. Ct. 1715, 1741, 10 L. Ed. 2d 915, 944 (1963) (noting that a prediction of anticompetitive effects "is sound only if it is based upon a firm understanding of the structure of the relevant market [and that] the relevant economic data are both complex and elusive").

**B. The Per Se Rule vs. the Rule of Reason.** Under the federal antitrust laws, challenged agreements or conspiracies are presumptively analyzed through the "rule of reason." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5, 126 S. Ct. 1276, 1279, 164 L. Ed. 2d 1, 7 (2006). This requires plaintiffs to demonstrate that a particular arrangement "is in fact unreasonable and anticompetitive before it will be found unlawful." *Id.* "*Per se* liability is reserved for only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Id.* (internal quotation marks omitted). "Some types of restraints . . . have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se*." *State Oil Co. v. Khan*, 522 U.S. 3, 10, 118 S. Ct. 275, 279, 139 L. Ed. 2d 199, 206 (1997).

In applying the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723, 108 S. Ct. 1515, 1519, 99 L. Ed. 2d 808, 816 (1988) (internal quotation marks omitted). By contrast, when a practice falls under the per se rule, there is no need for "case-by-case evaluation." *Id.* "The *per se* rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work . . . ." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886, 127 S. Ct. 2705, 2713, 168 L. Ed. 2d 623, 634 (2007).

Thus, " '[i]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations . . . .' " *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 9, 99 S. Ct. 1551, 1557, 60 L. Ed. 2d 1, 10 (1979) [hereinafter *BMI*] (alteration in original) (quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 607–08, 92 S. Ct. 1126, 1133, 31 L. Ed. 2d 515, 525 (1972)). Price-fixing agreements between competitors have been viewed as per se violations. *Texaco*, 547 U.S. at 5, 126 S. Ct. at 1279, 164 L. Ed. 2d at 7.

But not all agreements on price are governed by the per se rule. When Texaco and Shell formed a joint venture known as "Equilon" to collaborate in the refining and marketing of gasoline in the western United States, the fact that the resulting gas was sold under the Texaco and Shell names at a single price did not amount to per se illegal price fixing. *See id.* at 5–8, 126 S. Ct. at 1279–81, 164 L. Ed. 2d at 7–9. As the United States Supreme Court explained,

> Texaco and Shell Oil did not compete with one another in the relevant market—namely, the sale of gasoline to service stations in the western United States—but instead participated in that market jointly through their investments in Equilon. . . . [T]hough Equilon's pricing policy may be price fixing in a literal sense, it is not price fixing in the antitrust sense.

*Id.* at 5–6, 126 S. Ct. at 1279–80, 164 L. Ed. 2d at 7–8.

Similarly, in the *BMI* case, the Court held that the per se rule did not govern agreements among copyright holders to join together and issue blanket licenses at fixed rates. *BMI*, 441 U.S. at 16, 99 S. Ct. at 1560, 60 L. Ed. 2d at 14. As the Court said,

> [T]his is not a question simply of determining whether two or more potential competitors have literally "fixed" a "price." As generally used in the antitrust field, "price fixing" is a shorthand way of describing certain categories of business behavior to which the *per se* rule has been held applicable. The Court of Appeals' literal approach does not alone establish that this particular practice is one of those types or that it is "plainly anticompetitive" and very likely without "redeeming virtue." Literalness is overly simplistic and often overbroad. When two partners set the price of their goods or services they are literally "price fixing," but they are not *per se* in violation of the Sherman Act.

*Id.* at 8–9, 99 S. Ct. at 1556–57, 60 L. Ed. 2d at 9–10. The Court emphasized that the blanket license was not a " 'naked restrain[t] of trade with no purpose except stifling of competition,' " but instead "accompanies the integration of sales, monitoring, and enforcement against unauthorized copyright use." *Id.* at 20, 99 S. Ct. at 1562, 60 L. Ed. 2d at 16 (alteration in original) (quoting *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S. Ct. 696, 702, 9 L. Ed. 2d 738, 746 (1963)). The Court noted that the costs of individual sales transactions would be "prohibitive" and thus some form of blanket license was a necessity. *Id.* at 20–21, 99 S. Ct. at 1562–63, 60 L. Ed. 2d at 16–17.

**C. Monopsony vs. Monopoly.** As the plaintiffs point out, the present case does not involve cooperation on *sales* but rather collaboration on *purchases*—specifically, purchases of health care services. Thus, the concern is about potential monopsony power, not monopoly power. *See Mueller*, 818 N.W.2d at 249 n.3 (noting that the issue in the case is whether Wellmark is an alleged monopsonist rather than an alleged monopolist).

Still, monopsonistic conduct can create economic dislocation by forcing supplier prices down *below* the competitive level, just as monopolistic conduct can lead to dislocation by driving consumer prices *above* a competitive level. *See id.* (citing Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice* § 1.2(b), at 14 (4th ed. 2011)). In *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, the Supreme Court reversed the dismissal of a complaint brought by sugar beet growers, alleging that three sugar refiners had entered into an agreement to pay uniform prices for beets. 334 U.S. 219, 221, 246, 68 S. Ct. 996, 999, 1011, 92 L. Ed. 1328, 1333, 1345 (1948). As the Court put it, this arrangement "deprived the beet growers of any competitive opportunity for disposing of their crops by the immediate operation of the uniform price provision." *Id.* at 242, 68 S. Ct. at 1009, 92 L. Ed. at 1343; *see also W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 104 (3d Cir. 2010) (citing *Mandeville Island Farms*, 334 U.S. 219, 68 S. Ct. 996, 92 L. Ed. 1328) (noting that a conspiracy to depress reimbursement rates to medical providers can "pose[] competitive threats similar to those posed by conspiracies among buyers to fix prices and other restraints that result in artificially depressed payments to suppliers—namely, suboptimal output, reduced quality, allocative

inefficiencies, and (given the reductions in output) higher prices for consumers in the long run" (citation omitted)).

**D. Is This a Per Se Case?**   Having said this, we nevertheless agree with the district court that Wellmark's arrangements with self-insured employers and out-of-state BCBS affiliates are governed by the rule of reason, not the per se rule.  We reach this conclusion for several reasons.

To begin with, these arrangements are not naked price-fixing arrangements but are more akin to joint ventures.  The self-insureds are not entering into bare agreements to refrain from competing on price with Wellmark—they are buying claims-administration service from Wellmark.  Part of that service consists of Wellmark's negotiated pricing.  As in *BMI*, the record indicates that it would be highly impractical for the vast majority of participants in the alleged conspiracy (i.e., the vast majority of the self-insured employers) to engage in the numerous individual transactions that would be needed if they could not latch on to Wellmark's pricing.[1]  *Cf. BMI*, 441 U.S. at 20–21, 99 S. Ct. at 1563, 60 L. Ed. 2d at 17.

Wellmark's health care provider network is analogous to the blanket license in *BMI*.  It provides a mechanism by which an otherwise unavailable product (self-financed health coverage) can be offered.  *Cf. id.* If the only lawful choice for a self-insured employer were the time-consuming process of negotiating individual rates with health care

---

[1]The plaintiffs have included numerous pages of Wellmark reimbursement rates in the record.  For example, for chiropractic services alone, Wellmark has approximately forty-eight different reimbursement rates in a given year, including twenty-one different rates for examination of X-rays.  It seems implausible that a typical employer would have enough information about the value of chiropractic services to be able to negotiate with chiropractors on appropriate pricing for all these different procedures.

providers, the record indicates that almost all employers would avoid self-insuring. This would eliminate one possible way to render the health care market more efficient and reduce the costs of health care coverage— by allowing employers to bear the financial risk of health claims themselves.

Insurance involves both claims-handling and risk-spreading. A large number of Iowa employers, according to the summary judgment record, want some of the package but not all of it. That is, they do not wish to go into the health insurance business themselves but instead desire to purchase typical health insurance services from an outside entity like Wellmark. At the same time, those employers apparently have enough financial wherewithal to assume the ultimate risk that workforce claims will exceed workforce premiums.[2] Why should this additional option for employers be a per se violation of the antitrust laws?

Similar efficiency-related observations can be made about Wellmark's reciprocal arrangements with out-of-state BCBS licensees. Iowans insured by Wellmark occasionally need health care services outside Iowa. Rather than attempt to negotiate its own rates in all fifty states, Wellmark has a reciprocal arrangement with the BCBS affiliates in those states. Under that arrangement, Wellmark can utilize the other licensees' negotiated rates in their respective states, and they can use Wellmark's negotiated rates in Iowa (and South Dakota, where Wellmark also operates). This enables Wellmark to offer a fifty-state product that meets the needs of its customers while saving Wellmark from the

---

[2]Or they believe they can buy a different, cheaper form of protection against that risk, such as a stop-loss.

expense of having to maintain a network and rate structure in states where it has relatively few claims.[3]

In a somewhat different context, the Supreme Court has recognized that joint buying can "achieve economies of scale . . . that would otherwise be unavailable." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 286–87, 105 S. Ct. 2613, 2615, 86 L. Ed. 2d 202, 206 (1985). In *Northwest Wholesale Stationers*, the Court declined to apply a per se analysis to a member's claim that it had been wrongfully expelled from a nonprofit wholesale purchasing cooperative, noting that "such cooperative arrangements would seem to be 'designed to "increase economic efficiency and render markets more, rather than less, competitive." ' " *Id.* at 295, 105 S. Ct. at 2620, 86 L. Ed. 2d at 212 (quoting *BMI*, 441 U.S. at 20, 99 S. Ct. at 1562, 60 L. Ed. 2d at 16); *see also All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 744, 747–49 (11th Cir. 1998) (declining to apply a per se analysis to an arrangement whereby competing hospitals agreed to seek bids as a group for temporary nursing services); *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 925 (1st Cir. 1984) (rejecting antitrust claims and contrasting a legitimate, independent medical cost insurer with a " 'sham' organization seeking only to combine otherwise independent buyers in order to suppress their otherwise competitive instinct to bid up price").

---

[3]If the plaintiffs were right, then an Iowa bank and a Florida bank could not reach an agreement on what they would charge each other's customers for use of their ATMs, for example, when a customer of the Iowa bank travels to Florida or a Florida customer travels to Iowa. *See In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1007, 1017 (N.D. Cal. 2008) (finding that an agreement among banks concerning an ATM interchange fee should be governed by the rule of reason, not the per se rule).

Furthermore, neither of these types of Wellmark arrangements truly represents a horizontal agreement between competitors. *Cf. Texaco*, 547 U.S. at 5, 126 S. Ct. at 1279, 164 L. Ed. 2d at 7. Wellmark does not really compete with its self-insured clients. While a self-insured might elect not to use Wellmark's services, plaintiffs cite no example of a self-insured that markets those kinds of services to anyone else *in competition with* Wellmark. Nor does Wellmark compete with the out-of-state BCBS licensees. Its customers are in Iowa and South Dakota; the other licensees are licensed to sell health insurance in other states.[4]

Additionally, we agree with Wellmark that a decision of the United States District Court for the Northern District of Illinois is helpful and on point. *See N. Jackson Pharmacy, Inc. v. Caremark RX, Inc.,* 385 F. Supp. 2d 740 (N.D. Ill. 2005). In *North Jackson,* a retail pharmacy sued a pharmacy benefits manager that "administer[ed] prescription drug benefit plans on behalf of employers, health insurers and other third-party payors of prescription drug costs ('Plan Sponsors')." *Id.* at 744. As the court stated, "By negotiating prescription drug reimbursement rates on behalf of the 1,200 Plan Sponsors it represents, Caremark acts on behalf of what is essentially a cooperative purchasing group." *Id.* at 746. The pharmacy alleged a per se violation of section 1 of the Sherman Act on the theory that the plan sponsors were engaged in a horizontal conspiracy to fix prescription drug prices. *Id.* at 744–46.

The district court rejected the per se categorization. *Id.* at 747–51. The arrangement in question was not a "naked restraint," but one which

---

[4]The plaintiffs make a passing assertion that Wellmark and the other out-of-state BCBS affiliates have entered into an illegal horizontal market division agreement not to sell health insurance in each other's territories. This theory is not alleged in the petition nor supported by evidence in the record, and hence we will not consider it.

was "ancillary" to a broader venture with procompetitive potential. *See id.* at 747–48. The court elaborated,

> Any alleged agreement between Plan Sponsors to set the price paid for prescription drugs thus cannot be viewed in a vacuum, but must instead be looked at as a corollary of the cooperative arrangement between Caremark and the Plan Sponsors under which Caremark performs a variety of functions in the administration of Plan Sponsors' drug benefit plans. Those functions include not only the negotiation of reimbursement rates with retail pharmacies but also the processing of reimbursement claims, maintenance of patient records, design and management of drug formularies, negotiation of manufacturer rebates and maintenance of a mail order pharmacy. According to Caremark, those functions contribute to increased efficiency and a reduction in the cost of prescription drugs delivered to Plan Subscribers.
>
> . . . .
>
> As described by the [complaint] and the parties' submissions on the current motion, the arrangement between Plan Sponsors and Caremark clearly has efficiency-enhancing potential. Caremark specializes in various functions of benefit plan administration and is likely able to achieve economies of scale in the performance of those functions that would otherwise be unavailable to Plan Sponsors. And the creation of retail pharmacy networks, which necessarily involves the setting of reimbursement rates, undoubtedly contributes to the success of that larger endeavor.
>
> . . . .
>
> . . . That is of particular relevance here, where (as North Jackson itself alleges) PBMs [Pharmacy Benefits Managers] such as Caremark administer the prescription drug benefits of "approximately 210 million Americans; 70% of the U.S. population". Any premature ruling that one of the primary functions performed by PBMs is per se illegal would have particularly far-reaching consequences for the delivery of affordable prescription drugs to a large portion of the population, a consideration that further supports thorough rule of reason analysis.
>
> What has been said to this point should not be read as expressing an ultimate view as to the lawfulness of the alleged conspiracy between Plan Sponsors. If the required rule of reason inquiry were to reveal that the anticompetitive

consequences of any such conspiracy sufficiently outweigh its procompetitive benefits so that the restraint is ultimately judged unreasonable under Section 1, this Court would not hesitate to rule accordingly. But because no authority even suggests that all cooperative purchasing agreements run afoul of Section 1, and because the agreement at issue here is part of a larger and potentially procompetitive enterprise, the rule of reason must be applied to North Jackson's Claim I.

*Id.* at 748–51.

Another and related factor arises from a concern explained by *Kartell v. Blue Shield of Massachusetts, Inc.*, 749 F.2d 922, 931 (1st Cir. 1984):

[T]he subject matter of the present agreement—medical costs—is an area of great complexity where more than solely economic values are at stake. How to provide affordable, high quality medical care is much debated. And, many different solutions—ranging from stricter regulation to greater reliance on competing service organizations—have been proposed. This fact, too, warrants judicial hesitancy to interfere.

The conditions that were present in *North Jackson Pharmacy* prevail here as well. The arrangements here are not bare price-fixing agreements; indeed, unlike in *North Jackson Pharmacy*, there is not even an allegation that the various self-insureds have entered into agreements with *each other*. Rather, the self-insured employers have entered into significant relationships with Wellmark under which Wellmark provides much more than a price list—i.e., a network of providers; rules for eligibility, limitations, copays, and deductibles; and claims administration and processing. From the employee's standpoint, Wellmark appears to be providing traditional health insurance. The only difference is that the employer and not Wellmark is the ultimate financial backstop.

Also, similar to the situation in *North Jackson Pharmacy*, the record here indicates that there are potential efficiencies and economies of scale when employers rely on Wellmark to perform these functions, in which it has experience and expertise. The vast majority of employers could not realistically perform these duties on their own. There are also potential efficiencies and economies of scale when out-of-state insurers collaborate with Wellmark instead of trying to set up their own network for a relatively small number of Iowa claims.

Additionally, as in *North Jackson Pharmacy*, there are reasons for "judicial hesitancy" in classifying the challenged practices as per se violations of antitrust law. The plaintiffs themselves admit the practices are widespread. A large percentage of Iowans are covered by self-insured employer plans administered by Wellmark. The BlueCard® network is a national program used by health insurers and clients across the country. We should be reluctant to declare these arrangements flatly illegal, without considering their relative procompetitive or anticompetitive effects.

Plaintiffs seek to distinguish *North Jackson Pharmacy* on the ground that Wellmark is not a "mere independent third-party 'administrator'" but a "major competitor in the market for Iowa healthcare provider services." Yet we fail to see how this distinction helps the plaintiffs' cause. It is true that Wellmark provides a higher level of service than a "mere administrator." It is also true that Wellmark's health care provider network was set up at least in part for its own purposes, not merely as a device to enable group purchasing of health care services. But these factors, if anything, take the challenged arrangements even further out of the realm of naked restraints. The self-

insured employers are purchasing a bundle of preexisting services from Wellmark that most of them could not provide themselves.

Plaintiffs analogize this case to *Arizona v. Maricopa County Medical Society*, but we think the analogy is imperfect. *See* 457 U.S. 332, 102 S. Ct. 2466, 73 L. Ed. 2d 48 (1982). That case involved naked price-fixing: The physician members of a trade association were agreeing to abide by fee schedules. *Id.* at 340–41, 102 S. Ct. at 2471, 73 L. Ed. 2d at 56. There was no joint product or service being developed or sold. *See id.* at 339–40, 102 S. Ct. at 2470, 73 L. Ed. 2d at 55–56. The two wrinkles in the case were that the agreed-upon fees were *maximum* prices and the price-fixers were professionals. *Id.* at 348–49, 102 S. Ct. at 2475, 73 L. Ed. 2d at 61–62. Yet the Court found that neither of these considerations mattered and that the per se rule still applied. *Id.* It took note of Arizona's contention that so-called maximum prices can have the effect of stabilizing and enhancing the level of actual charges. *Id.* at 341–42, 102 S. Ct. at 2471–72, 73 L. Ed. 2d at 57.

This case might be comparable to *Maricopa County Medical Society* if the plaintiffs were claiming that Wellmark and other Iowa health insurers had simply agreed they would pay the same reimbursements to health care providers, without exchanging any meaningful services. Under *Maricopa County Medical Society*, it would not be a defense that the health insurers had agreed on minimum rather than maximum reimbursement rates.[5] 457 U.S. at 348–49, 102 S. Ct. at 2475, 73 L. Ed. 2d at 61–62. But that is not the situation here. We do not have a naked price-fixing agreement among competitors.

---

[5]Note again that the ultimate concern relates to monopsony rather than monopoly effects.

The plaintiffs also argue at some length that Wellmark has market power in health insurance in Iowa. This may be true, but it is not relevant to a per se claim. If plaintiffs' per se argument were correct, then it would be illegal for *any* insurer to make its insurance network pricing available to a self-insured that used the insurer's administrative and claims services even if the insurer had only a miniscule market share.

Additionally, the plaintiffs rely on Department of Justice and Federal Trade Commission guidance on health care. However, we believe the line that those agencies have drawn between per se and rule of reason conduct is consistent with the decision in this case. Consider the following passage from the 1996 *Statements of Antitrust Enforcement Policy in Health Care*:

> An agreement among purchasers that simply fixes the price that each purchaser will pay or offer to pay for a product or service is not a legitimate joint purchasing arrangement and is a per se antitrust violation. Legitimate joint purchasing arrangements provide some integration of purchasing functions to achieve efficiencies.

U.S. Dep't of Justice & Fed. Trade Comm'n, *Statements of Antitrust Enforcement Policy in Health Care* 67 n.17 (1996), *available at* http://www.justice.gov/atr/public/guidelines/0000.pdf. The challenged arrangements here are not simply agreements among purchasers to fix a price, which would be subject to per se treatment. To the contrary, both the self-insureds and the out-of-state BCBS licensees are obtaining a block of Iowa claims-related services from Wellmark. In other words, there is "integration of purchasing [and other related] functions to achieve efficiencies." *Id.*

We are not today foreclosing a rule of reason claim against Wellmark if it were shown that the anticompetitive consequences of its

practices exceeded their procompetitive benefits.[6] We simply uphold the district court's ruling that Wellmark's arrangements with self-insured employers and out-of-state BCBS licensees are not subject to the per se rule. Because the plaintiffs by stipulation limited themselves to a per se claim, we affirm the district court's grant of summary judgment.

## IV. Conclusion.

For the foregoing reasons, the district court's judgment is affirmed.

**AFFIRMED.**

All justices concur except Hecht and Appel, JJ., who take no part.

---

[6]As the court put it in *North Jackson Pharmacy,*

If the required rule of reason inquiry were to reveal that the anticompetitive consequences of any such conspiracy sufficiently outweigh its procompetitive benefits so that the restraint is ultimately judged unreasonable under Section 1 [of the Sherman Act], this Court would not hesitate to rule accordingly. But because no authority even suggests that all cooperative purchasing agreements run afoul of Section 1, and because the agreement at issue here is part of a larger and potentially procompetitive enterprise, the rule of reason must be applied to North Jackson's Claim I.

385 F. Supp. 2d at 750–51.